NEW YORK STATE MOTOR TRUCK AS-
SOCIATION, INC.; Roadway Express,
Inc.; Consolidated Freightways Corpo-
ration of Delaware; Yellow Freight
System, Inc.; United Parcel Service of
America, Inc.; ABF Freight System,
Inc.; Carolina Freight Carriers Corp.;
Affidavit of and A–P–A Transport
Corp., Plaintiffs,

v.

The CITY OF NEW YORK; Edward I.
Koch, in his capacity as Mayor of the
City of New York; Ross Sandler, in his
capacity as Commissioner of the Trans-
portation Department of the City of
New York; and, Benjamin Ward, in his
capacity as Commissioner of the Police
Department of the City of New York,
Defendants.

No. 86 Civ. 9118–CSH.

United States District Court,
S.D. New York.

March 2, 1987.

Frederick A.O. Schwarz, Jr., Corporation Counsel of the City of New York, New York City, for defendants; David Drueding, Grace Goodman, Susan Kath, of counsel.

Richard K. Willard, Asst. Atty. Gen., Robert J. Cynkar, Deputy Asst. Atty. Gen., Dennis G. Linder, Director, Civ. Div., Dept. of Justice, Washington, D.C., Kenneth N. Weinstein, Deputy Asst. Gen. Counsel for Litigation, U.S. Dept. of Transp., Washington, D.C., for amicus curiae U.S. Dept. of Transp.; Anthony J. McMahon, Chief Counsel, David C. Oliver, Deputy Asst. Chief Counsel, Federal Highway Admin., Washington, D.C., of counsel.

Bishop, Liberman, Cook, Purcell & Reynolds, New York City (Mark L. Davidson, Martin S. Siegel, of counsel), Bishop, Liberman, Cook, Purcell & Reynolds, Washington, D.C. (John C. Kirtland, Thomas M. Keeling, of counsel), for plaintiffs.

HAIGHT, District Judge:

This action arises out of the federal statutory scheme controlling use of the National System of Interstate and Defense Highways. The pertinent statute is the Surface Transportation Assistance Act of 1982 ("STAA"), as amended by the Tandem Truck Safety Act of 1984 ("TTSA"), 49 U.S.C. § 2301 *et seq.*

Plaintiffs are seven individual motor common carriers and their State Association. Defendants are the City of New York and, sued in their official capacities, the Mayor, the Commissioner of the City Transportation Department, and the Commissioner of Police (hereinafter sometimes collectively referred to as "the City.")

Plaintiffs move for a preliminary injunction enjoining the implementation and enforcement of the provisions of revised Article 19 of the City's Traffic Rules and Regulations. The parties agree that the threshold issues of statutory interpretation and regulatory authority present questions of law requiring no evidentiary hearing.

The parties have ably briefed and argued the issues. At the request of the Court, the federal Secretary of Transportation

(the "Secretary") submitted through the Department of Justice a brief *amicus curiae* supporting defendants and arguing against preliminary injunctive relief.

Defendants agreed to defer enforcement of the challenged regulations to permit this Court's careful consideration of the arguments and briefs. For that courtesy I express my thanks.

A preliminary injunction was entered on February 27, 1987, granting the relief prayed for by plaintiffs. This opinion sets forth the Court's reasons.

### I.

No American who owns a car is unfamiliar with the federally funded Interstate highway system. That system spans the nation, north to south, east to west. Its concrete passageways traverse fields and valleys, cross mountains, and, as the case at bar demonstrates, run through cities.

Acting pursuant to its constitutional power to regulate commerce among the states,[1] Congress has on occasion enacted laws that directly affect use of this national network of highways. The STAA is one such statute, enacted in 1982 in response to congressional concern over conflicting state laws regarding the use of the national highway system by some commercial trucks.

In *United States v. Connecticut,* 566 F.Supp. 571 (D.Conn.), *aff'd mem.,* 742 F.2d 1443 (2d Cir.1983), *aff'd mem.,* 465 U.S. 1014, 104 S.Ct. 1263, 79 L.Ed.2d 670 (1984), Judge Cabranes authored a useful discussion of the STAA's purpose. He observed that in 1956 Congress authorized a nationwide system of highways to be constructed by the states with the assistance of federal funds. One particular group of highways—the Interstate system or "Interstates"—is ninety percent funded by the federal government. 566 F.Supp. at 572. The Interstates, together with other "Federal-aid Primary Highways," form the "na-tional highway system." The STAA, in Judge Cabranes's words, "reflects a congressional interest in establishing uniform regulations governing the size, weight, and arrangements of trucks used in interstate commerce." *Id.* at 576.

A primary means of achieving regulatory uniformity in the STAA lay in its provisions preempting state regulation. Indeed, Judge Cabranes held in *United States v. Connecticut* that a Connecticut statute purporting to ban or regulate vehicles of a size approved by the STAA for use of Interstate highways was preempted by that federal statute, and was accordingly unenforceable.

The STAA's preemption provisions take two basic forms. One preempts state limitations on the size of vehicles that can use the Interstate system. The other preempts state restrictions on federally approved vehicles' use of or access to the Interstate system.

As to state limitations on vehicle size, the STAA as enacted in 1982 provided in pertinent part:

"Sec. 411.(a) No State shall establish, maintain, or enforce any regulation of commerce which imposes a vehicle length limitation of less than forty-eight feet on the length of the semitrailer unit operating in a truck tractor-semitrailer combination, and of less than twenty-eight feet on the length of any semitrailer or trailer operating in a truck tractor-semitrailer-trailer combination, on any segment of the National System of Interstate and Defense Highways and those classes of qualifying Federal-aid Primary System highways as designated by the Secretary, pursuant to subsection (e) of this section.

"(b) Length limitations established, maintained, or enforced by the States under subsection (a) of this section shall apply solely to the semitrailer or trailer or trailers and not to a truck tractor. No

---

1. The constitutional power to regulate commerce appears in Article I Sec. 8 of the Constitution. It has long been recognized that no form of state activity can thwart the plenary regula-tory power granted to Congress by the commerce clause. *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942).

State shall establish, maintain, or enforce any regulation of commerce which imposes an overall length limitation on commercial motor vehicles operating in truck-tractor semitrailer or truck tractor semitrailer, trailer combinations."

As to state restrictions on use of and access to the Interstate system, the STAA provided:

"(c) No State shall prohibit commercial motor vehicle combinations consisting of a truck tractor and two trailing units on any segment of the National System of Interstate and Defense Highways, and those classes of qualifying Federal-aid Primary System highways as designated by the Secretary pursuant to subsection (e) of this section."

This language was interpreted by Judge Cabranes in *United States v. Connecticut, supra,* as providing that "states may not prohibit tandem trailers, defined as single truck tractors with two trailing units, from any part of the Interstate System," 566 F.Supp. at 573. "Tandems" or "tandem trailers" are the sort of vehicles plaintiffs use, and which, as will be seen, the defendant City's new regulations particularly seek to restrict. I shall hereafter refer to such vehicular arrangements as "tandems."

In addition, the STAA provided:

"Sec. 412. No State may enact or enforce any law denying reasonable access to commercial motor vehicles subject to this title between (1) the Interstate and Defense Highway System and any other qualifying Federal-aid Primary System highways, as designated by the Secretary, and (2) terminals, facilities for food, fuel, repairs, and rest, and points of loading and unloading for household goods carriers."

Defendants in this case, unlike those in the *Connecticut* case, do not challenge the constitutionality of these provisions of the STAA, which are clearly within the scope of congressional authority. As Judge Cabranes stated in upholding the constitutionality of these provisions:

"To hold that Congress acted within its authority under the Commerce Clause, all that this court need determine is that Congress acted with respect to an activity affecting interstate commerce and that the action it took was indeed reasonably related to the regulation of that commerce."

*Id.* at 576, citing *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 261, 85 S.Ct. 348, 359, 13 L.Ed.2d 258 (1964).

It is readily apparent that in enacting the quoted provisions of the STAA, Congress intended explicitly to preempt state regulations of STAA vehicles that conflict with the provisions and purposes of the statute. Congressional power to do so is clear and unchallenged in this case.[2] The central issue is how far Congress intended its preemption of state regulations to operate. To pursue that inquiry an examination of subsequent congressional action is instructive.

## II.

The TTSA, passed in October 1984 to address problems Congress perceived in the STAA, had its genesis in the concern of two New York legislators. S.2217 was introduced by Senator Moynihan. The accompanying House bill, H.R. 5568, was introduced by then Congresswoman Ferraro. The expressed concern was that certain portions of the Interstate highway system running through New York City, constructed in earlier years and subsequently designated as part of the national system by the federal government, might not be safe for tandem trailers of the size permitted by the STAA. However, because the STAA contained no provision for the exemption of unsafe segments of Interstates from the preemption provisions of the statute, states had no option but to allow tandems access

---

**2.** The preemption doctrine is grounded in the Supremacy Clause of Article VI of the Constitution. Pursuant to that doctrine, which dictates that the laws of the United States shall be the supreme law of the land, a constitutionally enacted Federal law prevails over any competing state statute. *United States v. Connecticut, supra,* at 574 n. 5.

to these segments. Ms. Ferraro, appearing before the Senate subcommittee, pointed out that a number of Interstate highways passed through cities, giving rise to safety problems, but that "under the present law [STAA], States cannot prohibit tandem trucks on any segment, even if local, State, and Federal officials all agree that their operation would constitute a possible safety hazard." Statement of Congresswoman Ferraro before Senate Subcommittee on Surface Transportation hearing on March 22, 1984 at 11.

Senator Moynihan, in his statement to the subcommittee, called attention to the words of Judge Cabranes in *United States v. Connecticut, supra,* that: "There can be no question that pre-emption of state statutes barring tandem trailers was exactly what Congress sought to effect." 566 F.Supp. at 576. Senator Moynihan echoed Congresswoman Ferraro's concerns about the safety of Interstate highways in New York City, and went on to say:

"Mr. Chairman, the problems confronting the City of New York and other urban areas are not going to go away by themselves; the Congress must resolve the issue legislatively.

"I understand that the Department of Transportation (DOT) and the Federal Highway Administration (FHWA) have claimed that the States can mitigate the safety problems posed by the double and longer single trailers, by the exercise of State police powers. The FHWA, for example, suggested in the Federal Register that the States could impose land [sic; should perhaps be "load"] or hour-of-operation restrictions. I question, though, whether any such state regulation would survive a challenge in the courts. Judge Cabranes has said so."

*Id.* at 8.

The TTSA was enacted in order to amend the STAA to reflect and address these concerns. One significant provision was to engraft upon section 411 of the STAA a new subsection (i), which is now codified as 49 U.S.C. § 2311(i). That subsection permits the Governor of a state to request

that the federal Secretary of the Department of Transportation exempt a segment of the Interstate system from the preemptive provisions contained in subsections 411(a) and (c) of the STAA, 49 U.S.C. § 2311(a), (c). I need not set forth the provisions of 49 U.S.C. § 2311(i) in full. It is sufficient for present purposes to note that the subsection requires the Governor, before making such request of the Secretary, to "consult with units of local government in the State in which the specific segment . . . is located, as well as the Governor of any State adjacent to that State that might be directly affected by such exemption," § 2311(i)(2); to give consideration to "any potential alternative route" that could safely accommodate vehicles of federally approved length and serve the area in which the allegedly unsafe segment is located, § 2311(i)(2)(A), (B); and to transmit to the Secretary "specific evidence of safety problems that supports" the Governor's determination of lack of safety. § 2311(i)(3).

Section 2311 also provides that the Secretary may, on her own initiative, determine that a segment of Interstate highway is not capable of safely accommodating tandems. § 2311(i)(4)A. However, she may do so only after affording interested parties notice and an opportunity to comment. I need give no further consideration to this statutory provision, since, as will be seen from the following discussion, no one in this litigation (least of all the Secretary) even suggests that the City regulations at issue may be justified or upheld on the basis of this particular provision of the statute.

In addition, section 411(c), 49 U.S.C. § 2311(c), was amended to reflect the addition of subsection (i):

"No State shall prohibit commercial motor vehicle combinations consisting of a truck tractor and two trailing units on any segment of the National System of Interstate and Defense Highways (other than a segment exempted under subsection (i) of this section), and those classes of qualifying Federal-aid Primary Sys-

tem highways as designated by the Secretary pursuant to subsection (e) of this section."

And section 412, 49 U.S.C. § 2312, was amended so that it now provides:

"(a) No State may enact or enforce any law denying reasonable access to commercial motor vehicles subject to this chapter between (1) the Interstate and Defense Highway System (other than any segment thereof which is exempted under section 2311(i) or 2316(e) of this title) and any other qualifying Federal-aid Primary System highways, as designated by the Secretary, and (2) terminals, facilities for food, fuel, repairs, and rest, and points of loading and unloading for household goods carriers and for any truck tractor-semitrailer combination in which the semitrailer has a length not to exceed 28½ feet and which generally operates as part of a vehicle combination described in section 2311(c) of this title.

"(b) Nothing in this section shall be construed as preventing any State or local government from imposing any reasonable restriction, based on safety considerations, on any truck tractor-semitrailer combination in which the semitrailer has a length not to exceed 28½ feet and which generally operates as part of a vehicle combination described in section 2311(c) of this title."

The TTSA passed both houses of Congress on October 11, 1984 and was signed into law on October 30, 1984.

### III.

In addition to successfully urging upon Congress amendments to the STAA, representatives of New York lobbied the Federal Highway Administration ("FHWA") for regulations to alleviate the perceived safety problems. Section 411(d) of the STAA, 49 U.S.C. § 2311(d), authorized the Secretary of the federal DOT "to establish rules to implement the provisions of this section," a function the Secretary delegated to the Federal Highway Administrator. 23 CFR § 1.37.

The two-front legislative and bureaucratic war waged by New York State and City officials is described in the affidavit of Arthur Asserson, then an official of the City Department of Transportation ("DOT"). The City DOT had requested the assistance of the State DOT in negotiating these areas of concern with the FHWA. Eventually the FHWA issued in the June 5, 1984 Federal Register a "Final Rule" which was later codified at 23 CFR § 658 and its accompanying Appendix A. That rule contains provisions which defendants say authorize and justify the regulations at issue. I consider those provisions below. The defendant City's perception of its lobbying efforts and achievements appear in ¶¶ 16 and 18 of Mr. Asserson's affidavit:

"16. The lobbying effort had begun well before the FHWA issued its Final Rule of June 5, 1984, as a parallel effort to assure the safe use of New York City interstates in case negotiations with the Secretary to that end were unsuccessful. The final TTSA clarified and codified the ability of the Secretary to exempt entirely from any use by STAA vehicles any unsafe segments of the interstate system. The process outlined in the TTSA for obtaining an exemption paralleled in most respects the process that New York State and City DOT had already gone through to obtain limitations on interstate uses: a request through the State, submission of safety data, and consideration of alternative routes."

\* \* \* \* \* \*

"18. By the time the TTSA was finally passed in October 1984, the Secretary had already issued the Final Rule, which allowed New York City to impose time and permit limitations on its interstate segments.... Rather than seeking a total exemption of the New York City segments of the interstates pursuant to the new Law, the City DOT decided to simply develop time and permit regulations for use of these segments in accord with the existing Final Rule."

The "Final Rule" contains two provisions upon which defendants rely. 23 CFR § 658.11(f) provides generally:

"(f) *Restrictions.* Reasonable restrictions on the use of routes on the National Network by STAA authorized vehicles may be imposed during certain peak hours of travel or on specific travel lanes of multi-lane facilities. Restrictions related to construction zones, seasonal operation, adverse weather conditions or structural or clearance deficiencies may be imposed. States may restrict urban Interstate usage by vehicles authorized under the STAA by imposing detours to circumferential or bypass routes for vehicles not destined to locations within the area to be bypassed. All restrictions imposing urban Interstate detours, and on the use of the National Network based on hours of use by vehicles authorized by the STAA require prior FHWA approval. Requests for such restrictions on the National Network shall be submitted in writing to the appropriate FHWA Division Office. Approval of requests for restrictions will be contingent on the ability to justify significant negative impact on safety, the environment and/or operational efficiency."

Specific provisions with respect to interstate routes in New York State appear in Appendix A to the "Final Rule," which the defendants clearly regard as the final solution to their concerns. The function of the appendix is stated in 23 CFR § 658.5(f), which defines the "National Network" of roads as follows:

"*National Network.* The composite of the individual network of highways from each State on which vehicles authorized by the provisions of the STAA are allowed to operate. The network in each State includes the Interstate System and those portions of the Federal-Aid Primary System set out by the FHWA in the Appendix to this part."

Appendix A then describes, state by state, those roads which comprise the national network within each state's boundaries. A footnote (hereinafter "the footnote") appears at the end of the description for New York State. The footnote reads in pertinent part:

"The following Interstate routes in New York City are available to through traffic with operating limitations during the morning and evening peak traffic periods: I-95, from N.J. line to Westchester County Line; I-87, from I-95 to Westchester County Line; I-295, from I-95 to I-495; and I-495, from I-295 to Nassau County Line.

"Permits may be required for all other Interstates in New York City.

"For specific information contact the following: New York City Department of Transportation Traffic Council, Room 412, 51 Chambers Street, New York, New York 11007, Telephone (212) 566-3610."

Defendants argue that the regulations at issue are authorized by the Secretary of Transportation through the provisions cited above. Furthermore, at oral argument, counsel for defendants relied upon subsection (b) to section 412 of the STAA, which as noted *supra* was added by the TTSA in October, 1984, as additional authority for the challenged regulations.

I shall now consider those particular regulations which, purportedly on the authority of this statutory and regulatory scheme, the defendants have promulgated and propose to implement, and which plaintiffs seek to enjoin.

### IV.

As the Asserson affidavit states at ¶ 7: "New York City's principal interstates are I-95 (the Cross-Bronx Expressway and the Bruckner Expressway); I-278 (the Staten Island Expressway, Verrazano Bridge, and Brooklyn-Queens Expressway); I-495 (Long Island Expressway); I-295 (Clearview Expressway to Throg's Neck Bridge to Cross-Bronx); I-678 (Van Wyck Expressway, Whitestone Expressway and Bridge, Hutchinson River Parkway); I-895 (Sheridan Expressway); and I-87 (Major Deegan Expressway)."

Defendants' regulations, consistent with defendants' perception of the authority the FHWA bestowed upon them by the footnote, treat these interstates differently. The distinction lies between those "northeast corner" Interstate segments specifically referred to in the footnote (I–95, from N.J. line to Westchester County line; I–87, from I–95 to Westchester County line; I–295, from I–95 to I–495; and I–495, from I–295 to Nassau County line); and "all other Interstates in New York City."

The City's amended Article 19 of its Traffic Rules and Regulations appeared in the City Record for September 22, 1986.

Article 19, § 210(4) contains this definition:

"4. 'Designated qualifying highways' are:

"(a) I–95 from the George Washington bridge to the New England thruway;

"(b) I–295 from I–95 to I–495;

"(c) I–495 from I–295 to (Nassau county) the city line; and

"(d) I–87 from I–95 to (Westchester county) the city line."

Section 211(3)(b) provides:

"The length of a semitrailer or trailer on interstate or designated qualifying highways shall not exceed forty-eight feet except as provided in this subdivision; provided, however, that any trailer or semitrailer being used as a tandem shall operate only on designated qualifying highways and only between the hours of ten o'clock a.m. and two o'clock p.m., and between the hours of nine o'clock p.m. and seven o'clock a.m., the following morning, and the length of any such trailer or semitrailer shall not exceed twenty-eight and one-half feet."

The language of section 211(3)(b) clearly states, and the parties interpret it to mean, that (1) tandems can use those segments of Interstate highways lying in the City's northeast corner and which the City defines as "designated qualifying highways" only during certain hours of the day; and that (2) tandems may not use other Interstate highways within the City at any time.

That latter proscription is modified by provisions in the regulation "that permits may be obtained by extra-wide trucks for deliveries or pickups elsewhere in the City, along routes approved for this purpose by the City DOT." Defendants' brief at 6. The permit process is meant to address tandem operators' ability to reach their terminals, or their customers' terminals, which lie within the City's boundaries. The permit procedure had not been finalized when plaintiffs moved for relief. The affidavit of Carlo Montalbano, a City DOT official, dated December 5, 1986, stated at ¶ 4:

"Subject to adjustments based on our experience in current preliminary investigations of informal permit applications already received, the procedure is expected to operate as follows: terminal owners may request designation, by sending a letter to the City DOT requesting an application and sending it in; if, after a field inspection by the City DOT, the terminal is found to be qualified for designation, an approved route or routes will be developed by the City DOT to the terminal; the terminal owner will be issued a permit indicating that the terminal has been designated and showing the approved access route(s); the terminal owner will distribute photocopies of the permit to the STAA vehicle companies that use the terminal, with instructions that each tandem that travels to and from the terminal must carry a copy of the permit with its approved route(s) in the truck while traveling to and from the terminal, so that the permit along with the bill of lading may be checked by enforcement officers if necessary."

The "approved routes" for permit purposes may or may not consist of Interstate highways.

On the question of access, section 211.4 of Article 19 provides:

"Access on local highways for a distance of seven hundred fifty feet for the purpose of reaching facilities for food, fuel, repairs and rest, and access on specific access highways to reach designated ter-

minals, is allowed to tandems from designated qualifying highways during permissible hours and to vehicles one hundred two inches wide from the interstate highways or designated qualifying highways, except as otherwise provided in these rules and regulations."

And, finally, on the question of overall length, Article 19 provides:

211.3(c). "Any semitrailer with a length not to exceed forty-eight feet may be operated on any interstate or designated qualifying highway or access roadway provided that the total length of a combination of two vehicles including such semitrailer does not exceed fifty-five feet on such other public highway."

212.4. "The total length of a combination of vehicles, except government agency vehicles, inclusive of load and bumpers, shall not be more than fifty-five feet."

### V.

Plaintiffs contend that Article 19 violates the preemptive provisions of the STAA in three basic ways. First, they attack the length restrictions contained in § 211.3(c) and § 212.4. Second, they attack the use limitations imposed upon tandems (including the time limitations on the northeast corner segments, and the permit requirements elsewhere) contained in §§ 211, 212 and 215. Third, they attack the access restrictions contained in § 211. I discuss these in order.

### Length Restrictions

■ Defendants have not responded to plaintiffs' contention that the length restrictions contained in Article 19 are preempted by § 411(b) of the STAA. That section provides, in pertinent part:

"No State shall establish, maintain or enforce any regulation of commerce which imposes an overall length limitation on commercial motor vehicles operating in truck-tractor semitrailer or truck tractor semitrailer, trailer combinations."

49 U.S.C. § 2311(b).

Extensive analysis of the preemptive effect of this section on the length restrictions contained in Article 19 is not required. Those restrictions directly conflict with the clear language of § 411(b), as the defendants implicitly recognized by failing to defend them.

I hold, therefore, that §§ 211.3(c) and 212.4 of Article 19 are preempted by the STAA.

### Use Restrictions

At oral argument, counsel for defendants relied upon section 412(b) of the STAA, which as we have seen was added by the TTSA in October 1984, in support of Article 19's scheme of restricting tandems to certain Interstate segments and of requiring permits for access to the rest of New York City's Interstates. It will be useful to quote section 412(b) again:

"Nothing in this section shall be construed as preventing any State or local government from imposing any reasonable restriction, based on safety considerations, on any truck tractor-semitrailer combination in which the semitrailer has a length not to exceed 28½ feet and which generally operates as part of a vehicle combination described in section 2311(c) of this title."

Counsel said at argument:

"We believe our access restrictions and our permit system are authorized by that part of the statute rather than specifically by the footnote itself although it does refer to permits." Tr. 41.

The "permit system" to which counsel referred are those provisions of Article 19 which prohibit tandems from making any use of most of the Interstate highways that traverse New York City, unless permitted to do so under terms and conditions promulgated by the City DOT.

■ At first blush—indeed, at second blush—it is difficult to reconcile that construction of section 412(b) with the STAA's preemption provisions, which are sufficiently broad to preclude not only a state's barring of tandems from Interstates, but also "a scheme of burdensome regulation that could only have the effect of achieving

by an accumulation of petty irritations what [a state cannot] achieve through outright prohibition." *United States v. Connecticut, supra,* at 566 F.Supp. 575 n. 7.

If the City is correct in its interpretation of § 412(b), then the majority of the challenged provisions of Article 19 would have explicit congressional approval. An examination of congressional intent in enacting § 412(b) is clearly necessary to resolve this point, as the language of the section itself would appear to vitiate the previously quoted STAA provisions which bespeak a congressional intent to preempt the regulations that § 412(b) seems to approve. While there is almost no legislative history to explain the genesis of section 412(b), an examination of the entire TSAA's genesis is instructive.

On January 26, 1984 Senator Moynihan introduced the TTSA as S.2217, 98th Cong., 2nd Sess. He described the perceived problem in these words:

"In the Surface Transportation Assistance Act of 1982, Congress required the States to allow tractor-double trailer combinations and longer single trailers on all interstate highways and on certain Federal-aid primary highways designated by the Secretary of Transportation. We all assumed, I believe, that the entire Interstate Highway System possessed the necessary safety features—adequate shoulders, acceleration and deceleration lanes, ample radii on curves and the like—to make operation of the long trucks safe. This turns out not to be the case.

"In some of our major metropolitan areas, New York, Boston, and Philadelphia, for example, highways that had been built long before the interstate design standards were promulgated, were incorporated into the interstate system. Some of these roads do not possess the 12–foot lane width that is the minimum standard for interstate highways. The problem, in short, is that many of our urban interstate highways are just incapable of safely accommodating the larger vehicles.

"The Surface Transportation Assistance Act of 1982 also mandated that the larger trucks be granted reasonable access to downtown terminals, food, fuel, repair, and rest stops. That, at first glance, seems appropriate. But many of the terminals and stops are located more than a mile from highway exits. In order to reach the stops, then, the larger vehicles will have access to local streets in some of our must densely populated urban areas. I need hardly elaborate on the potential problems the large trucks could cause in some of the most congested areas of New York and elsewhere."

Cong.Rec., January 26, 1984, at S.246.

Senator Moynihan made clear his view that the solution must be federal, and could not be local:

"Mr. President, it is clear to me that the problems confronting the city of New York and other urban areas are not going to go away by themselves. The Congress must resolve the issue.

"I understand that the Department of Transportation and the Federal Highway Administration assert that the States can mitigate the safety problems posed by the double and longer trailers through the exercise of State police power regulation. Federal officials have suggested, for example, that the States might issue and enforce regulations restricting the hours of operation, or limiting the use of certain lanes.

"Permit me to inform the distinguished Members of this body, however, that counsel to the Environment and Public Works Committee questions whether such State regulations would be permissible, considering that Federal law, arguably, now has preempted State powers. And indeed, when the State of Florida attempted to enforce hour-of-operation regulations similar to those suggested by the FHWA and DOT, the U.S. Justice Department and the Transportation Department responded by filing an action in Federal court on September 26, 1983, to secure an injunction against the State regulations."

*Id.* at S.247.

In point of fact, Florida's time of day restrictions were subsequently held invalid under the Supremacy Clause of the Constitution as in conflict with the STAA. *United States v. Florida,* 585 F.Supp. 807 (N.D. Fla.1984), decided March 2, 1984. Judge Cabranes had reached his comparable conclusion in the *Connecticut* case in June, 1983.

Senator Moynihan described the remedy embodied in the TTSA as follows:

"My new bill would permit the Governor of a State, after consulting with local governments, to seek an exemption for any segment of the interstate highways that could not safely accommodate the larger trailers. The Governor would transmit all evidence to the Secretary of Transportation, who then would determine within 45 days whether the larger trucks could safely travel on the interstate section. The Secretary then would exempt those unsafe sections from the tandem trailer and large truck requirements of the Surface Transportation Assistance Act.

"I would also like to point out that this legislation requires the Secretary to consult with local governments to determine whether an alternative, and safe, route can be found for the larger trucks, substantially limiting the potential for disrupting the flow of interstate commerce upon which this Nation's great economy relies."

*Ibid.*

The text of S.2217, then set out in the Record, amends section 412 of the STAA *only* by adding a parenthetical reference to section 411(i), which contains the state Governor-instituted exemption machinery lying at the heart of the TTSA reforms. In other words, S.2217 contained no language of the sort which eventually emerged as section 412(b).

The Senate passed S.2217 on October 2, 1984. On that day Senator Moynihan again rehearsed the background of the problem. He said:

"The problem is clear: while many of our urban interstates cannot safely accommodate the larger vehicles, the STAA does not provide the Secretary of Transportation with the discretion to exempt those unsafe segments from the tandem trailer and larger truck requirements.

"Mr. President, these problems, which today confront the city of New York and other urban areas, are not going to go away by themselves. Under the Surface Transportation Assistance Act, the States do not have the power to bar the large trucks from unsafe sections of the interstate highways. Only Congress does, and Congress must resolve the issue."

Cong.Rec., October 2, 1984, at S.12575. After describing the provisions permitting state governors to apply to exempt segments of Interstates for safety reasons, Senator Moynihan added:

"I would like to point out that, under my bill, the authority for safety determinations rests with the Federal Government, where it ought to rest. The Secretary of Transportation will have final authority to approve or disapprove any request for exemption.

"The legislation would accomplish two important goals. First, it would provide the authority, now absent, for the Federal Government to exempt unsafe segments of the Nation's Interstate Highway System. Second, it would remove any remaining doubts about the authority of the States to exercise police powers to enforce hour of operation or similar restrictions."

*Ibid.*

S.2217 as enacted by the Senate amended section 412 of the STAA only to the limited effect previously noted.

On the House side, on November 1, 1983 Congresswoman Ferraro spoke in support of the companion bill, H.R. 5568. She said in part:

"Finally, Mr. Chairman, I would like to address recent comments by the Department of Transportation that this problem can be handled administratively. I must

respectfully disagree. The language in the act is very clear. It says, 'No State shall prohibit commercial motor vehicle combinations consisting of a truck tractor and two trailing units on any segment of * * * Interstate and Defense Highways.' In my judgment, DOT may even be on shaky legal ground in permitting lane and peak hour restrictions. And as we have seen in Florida, a State that imposes lane or time-of-day restrictions may find itself in court. The Department of Justice is suing Florida to prevent it from enforcing time-of-day restrictions in urbanized areas such as Miami and Tampa.

"Mr. Chairman, the only effective way to deal with this problem is with a simple technical amendment that sets up a process for the issuance of exemptions for those segments where they are warranted. That is what this amendment does, and that is why I am pleased that it is in the committee substitute."

Cong.Rec., November 1, 1983, at H. 8932.

H.R. 5568 came up for vote in the House on October 11, 1984. S.2217 was read. The House committee had resolved upon several amendments. One of those added subsection (b) to section 412 of the STAA. See Cong. Rec., October 11, 1984, at H. 12221. Congressman Anderson said of that particular amendment:

"Another provision extends the reasonable access provision to 28½–foot single trailers. However, I would emphasize that States and localities are not prevented from imposing reasonable restrictions based on safety considerations."

*Id.* at H. 12214.

The Senate accepted the House amendments. The TTSA passed S.2217 as amended on October 11, 1984.

The committee reports on TTSA contain no discussion of new section 412(b). The quoted floor remark of Mr. Anderson appears to be the only contemporaneous piece of legislative history on that subsection.

However, the committee report for the earlier statute, the STAA, sheds some light on the context in which present subsection 412(b) finds itself.[3]

The House Conference Committee report, in contrasting the House and Senate versions of what ultimately became the "reasonable access" provisions of its bill, said this:

"Subsection (h) of section 127 of title 23 provides that States must permit vehicles subject to this section reasonable access to and from the Interstate System, terminals, and facilities for food, fuel, and rest. This provision is not intended to preempt a State's reasonable exercise of its police powers with respect to safeguarding public safety on roads within the area of its jurisdiction."

*Id.* at 3714.

The report summarizes the Senate version as follows:

"No State may deny reasonable access to and from the interstate and federal aid system and terminals and facilities for food, fuel, repairs, and rest."

*Id.* at 3715.

The STAA passed the House on December 21, 1982 and the Senate on December 23, 1982.

■ The conclusion I draw from all this is that when, during the year following the STAA's enactment, the problems addressed in the TTSA surfaced, the House determined to make explicit in section 412(b) its implicit understanding (expressed in the Conference Committee Report) that in guaranteeing tandems reasonable access to the Interstates, Congress did not intend "to preempt a State's reasonable exercise of its *police powers* with respect to safeguarding public safety on roads *within the area of its jurisdiction.*" (emphasis added). I ascribe that very limited concept of non-preemption to subsection 412(b) as ultimately enacted in the TTSA. Thus construed, subsection 412(b) cannot be read to authorize

---

**3.** The legislative history for the STAA appears at 1982 U.S.Code Cong. and Admin.News pp. 3639 *et seq.* The House Report and House Conference Report are set out. No Senate Report was submitted with the legislation.

state prohibitions or restrictions of tandems' use of the Interstates or Federal Aid Primary Highways themselves. Instead, § 412(b) permits nothing more than the reasonable exercise of state police power over roads within state jurisdiction to regulate access to and from federal highways.

■ Accordingly, I hold that the City's reliance on § 412(b) in support of its use limitations on certain Interstates in its northeast corner, and its requirement of permits for use of all other Interstates within City limits, is misplaced. I discuss *infra* the effect of § 412(b) on those portions of revised Article 19 which purports to regulate access to and from the City's Interstates.

The City's second argument in support of Article 19's limitation of tandems to certain Interstates and concomitant permit requirements is that these regulations are authorized by the Secretary of Transportation. The Secretary joins this argument, and further argues that the Secretary's power to approve such restrictions is authorized by Congress.

The purported source of statutory authority claimed by the Secretary rests in two sections of the United States Code. The first is found in the STAA itself: § 411(d), codified at 49 U.S.C. § 2311(d), which authorizes the Secretary "to establish rules to implement" the relevant portions of the STAA. The second is a general grant of authority to the Secretary codified at 49 U.S.C. § 2302(a), (b), which permits her to prescribe regulations to carry out her responsibilities and to delegate responsibilities to federal Department of Transportation ("DOT") officers and employees. The Secretary claims that the City's regulations were approved by the Federal Highway Administration ("FHWA"), as evidenced by the Final Rule and the footnote discussed above in Section I of this Opinion. See 23 C.F.R. 658.

Both the City and the Secretary characterize the restrictions on tandem use of the City's Interstates recognized in the footnote as a reasonable treatment of the special needs of the New York area. Tandems that do not carry loads destined for the City are allowed to bypass the City, during certain hours, along its northern boundary. Tandems with loads destined for the City, or those originating within the City, may use other portions of the City's Interstates, but only after requesting and receiving the proper permits.

In her brief *amicus curiae*, the Secretary characterizes the footnote as the FWHA's approval "in principle" of these reasonable regulations. The proposed time of operation limitations, for example, are described by the Secretary as approved "on a six-month trial basis." Furthermore, the Secretary explicitly recognizes that the as yet undefined permit scheme contemplated by the City may be in direct conflict with the STAA. She states: "To the extent the City plans to implement permit requirements that would be tantamount to a prohibited exclusion, they would be invalid and unenforceable." Brief at 4.

■ Even with those qualifications on the footnote's seemingly blanket approval of Article 19, I cannot accept the contention that the Secretary's authority is so far reaching that she may approve use restrictions that are otherwise preempted by the STAA. I return, therefore, to the central issue in this case: are the restrictions at issue preempted by the STAA?

The Secretary and the City argue that they are not preempted. They contend that all Congress explicitly forbids is state regulations of commerce which *prohibit* STAA approved vehicles from Interstate and other designated highways. Regulations based on safety considerations which do not prohibit STAA vehicles are, the argument concludes, not in conflict with the STAA.

■ In support of this view, the Secretary cites dicta from a footnote in Judge Cabranes' decision in *State of Connecticut, supra.* Judge Cabranes there noted, and I agree, that some use restrictions "might be justified as being either in accordance with federal law or permissible as exercises of the State's 'police power.'" *Id.* 566

F.Supp. at 575 n. 7. This observation, however, does not address the particular issue here, which is whether these specific restrictions are in accordance with federal law.

State laws can be preempted by Congress in either of two general ways. As the Supreme Court has recently stated:

"If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. *If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law,* that is, when it is impossible to comply with both state and federal law, or *where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.*"

*Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted, emphasis supplied).

As the highlighted portions of the quoted language demonstrates, the Secretary's argument that the STAA does not explicitly preempt state safety regulations is not a sufficient argument to compel the conclusion that the regulations here at issue are valid. Even if the Secretary's view that Congress did not intend to occupy the entire field of tandem regulation is correct, the challenged regulations may still be preempted. The alternate prong of preemption analysis, as set forth in *Silkwood,* would still require an analysis of the objectives of the STAA, along with an examination of the challenged regulations in light of those objectives.

It is self evident that the power to require permission for an activity implies the power to forbid that activity. In the instant case, the City claims that its power to subject tandem operators to an undefined permit process in order to operate tandems on certain City Interstates is not in conflict with the STAA.

■ Analysis of the validity of this requirement under preemption doctrine does not require extensive consideration of congressional objectives. Here, the plain language of the STAA controls. Inasmuch as the City's scheme implies that it possesses the power to deny tandems access to any Interstate within the City limits, the City is clearly wrong. Because the City has no power to deny tandems the use of Interstates, STAA § 411(c), it also has no power to place conditions on such use that could result in denial. Even if permits were to be freely given for any stated reason at all, it is clear that the City lacks the power to deny permit-less tandems use of the Interstates. The conclusion that the City's proposed permit system is invalid is inescapable.

■ Turning to Article 19's time of day restrictions on tandems' use of the northeast corner Interstate segments, I hold that they also fall within the clear language of STAA § 411(c) forbidding state use prohibitions. Enforcement of regulations limiting use of the Interstates to certain hours of the day necessarily prohibits use during the other hours of the day. Nothing in the statute or its legislative history authorizes partial prohibitions by the states. The articulated purpose of the statute is quite to the contrary. I am in entire agreement with Chief Judge Stafford in *United States v. Florida,* 585 F.Supp. 807, 810 (N.D.Fla.1984) that a state regulatory scheme undertaking to "restrict the days and hours of operation of any segment of the tandem truck network based on considerations of safety, roadway facility capability, and public convenience" (those being the provisions of the challenged Florida statute) is in direct conflict with the STAA, preempted by the federal statute, and hence unenforceable.

■ Even if I had concluded that this use restriction was not in direct conflict with the express terms of the federal statute, the restriction would nonetheless fail under the alternative prong of preemption analysis, which inquires whether a state law conflicts with congressional objectives

expressed in federal statutes. Such conflict is obviously present in the case at bar.

The objectives of the STAA have been examined generally in Part I of this Opinion. It is sufficient to reiterate here that Congress' primary objective in enacting the STAA was to relieve commercial trucking operators of the burden inherent in planning and operating a multistate haul by tandems through states with conflicting regulations of tandem operations.

If New York State (or New York City) possess the power to limit federally approved tandems' use of Interstate highways within their borders, then other, adjoining states, in this case New Jersey and Connecticut, would possess similar powers to limit the hours of operation of tandems on Interstate highways within *their* borders. The potential for paralysis of federally approved tandems moving in interstate commerce is manifest. As plaintiffs' counsel noted at oral argument:

> "If [New York, New Jersey and Connecticut] were [each] to adopt a so-called use restriction geared to a time of day, and [these restrictions] were not perfectly synchronized, they could in fact make this region totally impassable to STAA equipment."

Tr. p. 17.

The Secretary of Transportation herself, in *United States v. Florida, supra,* took the position that the time restrictions there at issue "effectively undermine[d] the goals of the STAA." Secretary's Memorandum at 18. She noted the particular difficulty that long distance haulers would face trying to coordinate their delivery schedules to avoid the prohibited hours. *Id.* at 19. The Secretary was right in *Florida.* She is wrong here.

Clearly the exercise of state power to restrict the hours of operation of tandems on the Interstates conflicts with the objectives of the STAA. To allow these regulations would be to invite a return to the patchwork of local restrictions on tandems that prompted Congress to enact the STAA in the first place. In consequence, I hold that these restrictions are preempted under either branch of the preemption analysis.

 I am both mindful and respectful of the Secretary's argument that this Court should defer to her conclusion that she is authorized by statute to approve state regulations of STAA approved tandems on the National highway system. But deference to an agency's construction of the statute which it administers is appropriate only when Congress has not directly addressed the precise question at issue, *Chevron U.S.A. v. NRDC,* 467 U.S. 837, 843, 845, 104 S.Ct. 2778, 2781, 2783, 81 L.Ed.2d 694 (1984), a circumstance that arises if it can fairly be said that Congress "did not actually have an intent" regarding the point at issue. In this case, the precise question is whether the Secretary's regulatory authority permits her to sanction state regulations which, while falling short of total prohibition, significantly limit the operation of tandems on Interstates within their borders.

 I have previously concluded that use limitations, whether imposed by time restrictions or requiring permits, constitute prohibitions which the STAA expressly preempts the states from imposing. The Secretary therefore lacks authority to approve state prohibition by federal regulation. I owe no deference to her seeming effort to do so.

Even if the STAA should be read as not specifically addressing the issue of partial prohibition by use restriction, I could not conclude that Congress "did not actually have an intent" regarding this issue. *Chevron U.S.A., supra.* As discussed *supra,* Congress clearly intended to deny states regulatory power that would burden the interstate operation of tandems. I cannot accept the Secretary's contention that I should defer to a statutory construction authorizing her to approve manifestly burdensome state regulatory restrictions.

Furthermore, the Secretary fails to identify the statutory source of her authority to approve or disapprove state regulations grounded in whatever residual police power states possess over federally approved vehicles. She claims that the FHWA approv-

al mechanisms are implicitly authorized by § 411(d) of the STAA because "implementation" of the STAA requires "clarif[ica-tion] [of] the extent of the states' authority." Brief at 13. In effect, the Secretary claims the power to decide, in the first instance, whether state regulations conflict with the congressional purpose embodied in the STAA. Accepting, for the sake of argument, the existence of that power, the Secretary cannot stretch it so far as to justify approval of state regulations which conflict with the congressional purpose of the STAA. Any such approval would be entitled to no deference at all by a reviewing court.[4] I conclude that even deferring to the Secretary's construction of § 411(d) as allowing her to require FHWA approval of state tandem regulations, I am not constrained to accord any weight to her conclusion that these particular regulations do not violate the congressional objectives behind the STAA.

The Secretary relies heavily on the fact that Congress was made aware, during hearings on the TTSA, that the Secretary believed she possessed ample authority to approve reasonable use restrictions. Since Congress did not explicitly reject this view in the TTSA, the Secretary concludes that Congress consents to the full exercise of the power she now claims. This conclusion misses the mark.

As set out in detail above, while Congress considered the TTSA it was made fully aware of the Secretary's position *and* the position of the bill's sponsors that questioned the validity of the Secretary's view of her authority. If Congress had fully accepted the Secretary's position, the TTSA would have been unnecessary. The problems it was intended to resolve would have been left to the Secretary. Adoption of the TTSA without specific reference to the Secretary's view under these circumstances

cannot be interpreted as approval of that view *sub silentio.*[5] On the contrary: in the TTSA the Congress remedied the Secretary's inability to deal with local problems by enacting a particular and detailed mechanism for exemption which the Secretary, in the case at bar, circumvents by purportedly authorizing the City's regulations. Far from impliedly consenting to that authority in the Secretary, Congress in its statutory scheme precluded it.

■ An additional use restriction relates to the width of tandems and the highways within the City upon which they move.

Section 211.2 of Article 19 provides:

"The maximum width of a vehicle, inclusive of load, may be up to one hundred two inches, plus safety devices; provided, however, that vehicles of such width may travel only on interstate or designated qualifying highways with traffic lanes designed to be a width of twelve feet or more...."

Since the phrase "designated qualifying highways" is defined by § 210(4) as comprising the four segments of the Interstate highways transversing the northeast corner of the City, the practical effect of § 211.2 is to provide that tandems of a width of 102 inches can travel on Interstate highways within the City's borders only if those Interstates have traffic lanes with a width of twelve feet or more.

It is common ground that some of the Interstate segments within the City do not have twelve-foot widths. Accordingly, if this regulation is enforceable, tandems of a width expressly sanctioned by the STAA would not be able to use Interstate highways within the City's boundaries.

---

**4.** "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear Congressional intent." *Chevron, supra,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9.

**5.** *Cf. United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 464, 88 L.Ed.2d

419 (1985) (even when administering agency's construction is explicitly called to the attention of Congress in an unsuccessful attempt to convince Congress to supplant the agency's construction, Congress' failure to act is merely "some evidence" of the reasonableness of the agency's construction).

That use restriction is unenforceable. Section 416(a) of the STAA, as amended by the TTSA, 29 U.S.C. § 2316(a), reads in pertinent part:

"Except as provided in subsection (e) of this section, no State, other than the State of Hawaii, shall establish, maintain, or enforce any regulation of commerce which imposes a vehicle width limitation of more or less than 102 inches on any segment of the National System of Interstate and Defense Highways (other than a segment exempted under subsection (e) of this section), or any other qualifying Federal-aid highway as designated by the Secretary of Transportation, with traffic lanes designed to be a width of twelve feet or more, or any other qualifying Federal-aid Primary System highway designated by the Secretary if the Secretary determines that such designation is consistent with highway safety;...."

Subsection (e) of § 416, referred to in subsection (a), constitutes a comparable provision for exemption machinery.

Thus we see that § 416(a) expressly sanctions vehicles of a width of 102 inches, and prohibits the states from passing regulations pertinent to them.

It is true that § 416(a) contains a reference to highways with traffic lanes of a width of twelve feet or more. But plaintiffs argued in their initial brief that the lane-width restriction set forth in the STAA, § 416, applies:

"... *only* to those Federal-aid Primary Highways—not interstates—designated by the Secretary to become part of the National Network. It was not meant to be and is not a restriction on the use of interstates. Thus, under the STAA which mandates the unrestricted use of all the interstates by 102–inch wide vehicles, the City cannot bar such vehicles from any segment of interstate, irrespective of the design width of the segment's traffic lanes."

Brief at 20.

To this statutory construction neither the City nor the Secretary make a response or pick a quarrel.

In point of fact, the 12–foot lane provision would appear to restrict the Secretary's power to designate non-Interstate highways, rather than tandems' rights to use them. That was the issue in *Center for Auto Safety v. Dole*, 582 F.Supp. 1444 (D.C.1984), where plaintiff challenged the Secretary's designation of certain non-interstate highways as part of the national network on the ground that some of those highways had lanes of less than twelve-foot width. The parties and the Court clearly shared the perception that the twelve-foot requirement applied only to additionally designated highways, and not to the Interstates. Thus the Court, in summarizing the Secretary's contentions, stated at 582 F.Supp. 1448:

"The Secretary presented evidence that such a system requires, *in addition to* the Interstate System, designation of Primary System roads which include segments with a lane width of less than 12 feet."

Earlier, the Court observed that in a related appropriations act:

"... Congress also directed that no federal-aid highway funds be apportioned to any state which imposes a vehicle width limitation of more or less than 102 inches on the Interstate System *or* on designated Primary System highways which meet a 12–foot lane width requirement."

*Id.* at 1447 (emphases added).

The legislative history lends no support to a suggestion that the twelve-foot lane requirement has anything to do with Interstate highways.

Accordingly § 416(a) of the STAA preempts § 211.2 of the City's regulations. That regulation is unenforceable.

For the foregoing reasons, I conclude that the City's use restrictions are invalid.

*Access Restrictions*

Plaintiffs' challenge to the access restrictions contained in Article 19 focus on § 211.4, which provides:

"4. Access on local highways for a distance of seven hundred fifty feet for the

purpose of reaching facilities for food, fuel, repairs and rest, and access on specific access highways to reach designated terminals, is allowed to tandems from designated qualifying highways during permissible hours and to vehicles one hundred two inches wide from the interstate highways or designated qualifying highways, except as otherwise provided in these rules and regulations."

and § 211.5(a):

"5. Single use permit. (a) Upon application in writing and good cause being shown, the commissioner may issue a single use permit to operate or move a vehicle or a combination of vehicles, the weights or the dimensions of which exceed the limitations provided for in this section upon any interstate or designated qualifying highway. Every such permit may designate the route to be traversed and may contain any other restrictions or conditions deemed necessary by the commissioner."

Plaintiffs contend that this section conflicts with § 412(a) of the STAA, quoted *supra,* which guarantees tandems access between Interstates and (1) terminals and points of loading and unloading for household goods and (2) facilities for food, fuel, repairs and rest. The challenged regulations restrict such access in two ways. Access to food, fuel, repairs and rest is limited to those facilities—if any there be—found within 750 feet of the Interstate highways. To the extent that § 211.4 incorporates Article 19's use limitations discussed above, those limitations are invalid. I assume in this discussion that § 211.4's reference to "specific access highways" does not include any segments of Interstate highway. Access to terminals and points of loading and unloading of household goods is subject to an ill defined permit process.

 If these access restrictions are permissible, it is only because they fall within § 412(b) of the STAA, considered in detail above. That section, as I have construed it, permits states to impose reasonable restrictions on tandems based on safety con-

siderations operating on roadways not otherwise subject to the STAA's preemptive provisions. States may not impose unreasonable restrictions pursuant to § 412(b), nor may they impose restrictions that are not based on safety considerations, nor may they impose restrictions that interfere with tandem operators' rights to reasonable access to the facilities in question.

The regulations under consideration suffer from a fatal flaw: they fail to provide the City Commissioner of Transportation with any guidance on what criteria govern the issuance of the contemplated permits.

For example, the "specific access highways" referred to in § 211.4 refers—I presume, but do not decide—to § 210.1(b)'s definition of "access highways." These are "roadways connected to designated qualifying highways *as approved for use by the Commissioner.*" In a similar vein, "terminals" are required to be "qualified and approved by the Commissioner." § 210.19(a).

No procedures for petitioning the Commissioner to approve access roads or terminals is specified. No limit is placed on the Commissioner's discretion in approving or disapproving access roads or terminals. Permits for "single use" are to be issued "for good cause shown," but the regulation contains no indication of what the Commissioner should consider to be "good cause."

It is not possible for this Court to attempt to anticipate the factors the Commissioner might consider in exercising the discretion accorded him under Article 19 and then to test those factors to see if they are based on safety considerations and accord tandem operators their guaranteed reasonable access.

The regulation is facially defective because it empowers the Commissioner to deny tandem operators their guaranteed reasonable access by its creation of unfettered discretion in that office.

The restriction of tandems to facilities for food, fuel, repairs and rest within 750 feet of Interstates may be based on safety considerations and may be generous

enough to provide reasonable access to those facilities. *See* Asserson Aff. ¶ 28 ("Fuel and repair stations, diners and motels in New York City are customarily located at intersections within this distance of interstate exits," citing no empirical data or other authority.). *But see Consolidated Freightways v. Larson, et al,* 647 F.Supp. 1479 (M.D.Pa.1986) (Because only 8% of the necessary facilities in the State were within the .2 mile limit, that limit denied reasonable access).

However, I am not required to consider the 750 foot restriction separately from the rest of the restrictions contained in § 211.4. As Judge Cabranes noted in the *Connecticut* case:

> "This court cannot undertake the legislative task of separating the benign from the malignant portions of [the challenged section]. [That section] must be taken as it comes, as a unified piece of legislation."

*United States v. Connecticut, supra,* 566 F.Supp. at 575, n. 7.

The requirement of permits and the limitation of tandems to approved roadways destined to approved terminals is clearly malignant for the reasons set forth above. The inclusion of possible benign limitations in the same section is inconsequential. The entire section is invalid, as is § 211.5(a), because it offends STAA § 412(a)'s guarantee of reasonable access.

*Preliminary Injunctive Relief*

The standard governing the grant of preliminary injunctive relief in this circuit is clear. A party seeking such relief must (1) make "a showing of (a) irreparable harm and (b) either likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship's tipping decidedly" in favor of the party seeking preliminary injunctive relief. *Jackson Dairy, Inc. v. H.P. Hood and Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979); *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42 (2d Cir.1983). It is clear from the foregoing discussion that on the merits of plaintiffs' action against the

challenged regulations the plaintiffs have demonstrated at least a "likelihood" of success on the merits. An injunction will not issue, however, unless plaintiffs have also demonstrated that they will suffer irreparable injury if the challenged regulations are permitted to take effect during the pendency of this law suit.

Plaintiffs have submitted copious affidavit testimony on the effect these regulations would have on their trucking operations. Because the challenged amendments to Article 19 would effectively prohibit tandems from efficient use of the New York City Interstates, the individual trucking company plaintiffs would unquestionably suffer serious disruption of their daily operations.

 Irreparable injury is suffered when monetary damages cannot adequately compensate an injured party or where monetary damages cannot be calculated to a reasonable degree of certainty. *New York Path. & X–Ray Lab., Inc. v. I.N.S.,* 523 F.2d 79, 81 (2d Cir.1975); *Miller Brewing Co. v. Carling O'Keefe Breweries,* 452 F.Supp. 429, 438 (W.D.N.Y.1978).

 Plaintiffs contend that they will suffer irreparable injury due to the severe disruption of their trucking operations that would result from enforcement of the challenged regulations. For example, E. Lee Frazee, Vice President for Transportation of plaintiff Consolidated Freightways Corp., estimates that the challenged regulations would result in over one million extra highway-miles-per-year added to their total highway miles driven. Frazee Aff. ¶ 16. Furthermore, Mr. Frazee avers that the decreased efficiency resulting from a forced return to pre-tandem equipment would be substantial, but impossible to calculate with certainty. *Id.,* ¶¶ 8, 15. Jerry A. Yarbrough, Senior Vice-President for Operations of plaintiff ABF Freight System, Inc., avers that the increased costs and concomitant forced price increases to New York City customers occasioned by the challenged regulations would threaten their customer base. Yarbrough Aff. ¶ 12.

Also, John T. Cram, Vice President, Northeast Division for plaintiff Roadway Express, Inc., states that the challenged regulations would significantly reduce the value of his company's $300 million investment in tandem equipment, albeit in an amount that cannot be effectively quantified. Cram Aff. ¶ 13.

Defendants make no effective response to these detailed and inherently plausible assertions.

On this record, I am satisfied that enforcement of the challenged regulations would cause plaintiffs significant economic losses that are not capable of reasonably certain calculation as to amount. That is sufficient to demonstrate the requisite irreparable injury.

*Conclusion*

I am not unmindful of the City's firm belief that the challenged regulations would enhance the safety of the City's Interstate highways and access roadways. The issues before me, however, neither require nor permit judicial consideration of the merits of the City's intended scheme of tandem regulation. Under our system, certain "use restrictions" apply to this Court. As Judge Cabranes rightly said:

> "The question before this court is not whether the Federal law on tandem trailers is less reasonable or less sound than the [challenged] statute ... The Federal law may well entail serious risks for the driving public ... Nevertheless, for good or for ill, it is a law enacted by our national government on a subject over which its powers are clear and complete, and Federal Judges are not commissioned for the purpose of deciding cases on the basis of their personal political preferences."

*United States v. Connecticut, supra,* 566 F.Supp. at 574, n. 5.

For all the foregoing reasons, the defendants were preliminarily enjoined from implementing or enforcing the challenged revisions to Article 19 of New York City's

Traffic Rules and Regulations by order dated February 27, 1987.