**NEW HAMPSHIRE MOTOR TRANS-
PORT ASSOCIATION, et al.,
Plaintiffs, Appellants,**

v.

**TOWN OF PLAISTOW, Defendant,
Appellee.**

No. 94–2095.

United States Court of Appeals,
First Circuit.

Heard May 1, 1995.

Decided Sept. 20, 1995.

Order on Petition for Rehearing
Oct. 25, 1995.

Mark I. Zarrow with whom Lian, Zarrow, Eynon & Shea, Worcester, MA, was on briefs, for appellants.

Melinda S. Gehris with whom Marjorie E. Lanier and Devine, Millimet & Branch, P.A., Manchester, NH, were on brief, for appellee.

Before CYR, Circuit Judge, ALDRICH, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

This appeal presents a challenge to a town zoning ordinance and cease and desist order that limit night-time access to and from a local trucking terminal. Appellants are the terminal owner, the terminal operator, various interstate motor carriers that regularly use the terminal, and an association representing New Hampshire truckers. Appellee is the Town of Plaistow, New Hampshire, ("the town"), which adopted the restrictions at issue. The terminal is located on a site partly in Plaistow and partly in Newton, New Hampshire.

The trucking terminal began operation in September 1988. It serves as a regional hub for various trucking companies serving the New England area. Line haulers from around the country drop off freight to be delivered in New England and pick up freight whose destination lies outside New England. Atlas Motor Express, Inc. ("Atlas"), the operator of the terminal, maintains a fleet of trucks and provides short haul service within the New England area. The terminal operates 24 hours a day, loading and unloading trailers.

Most trucks that use the Plaistow/Newton terminal reach it from Interstate 495, a federal highway that runs through Massachusetts and near the New Hampshire border. From Interstate 495, trucks travel about 5 miles on Route 125 to Kingston Road (both are New Hampshire state highways) and then about half a mile to Garland Way, the terminal's private access road. Trucks must travel roughly 2000 feet along Garland Way, the first portion of which passes through the Plaistow residential zone. The terminal's facilities are all located in Newton in an industrial zone bordering on Plaistow.

Shortly after the terminal opened, numerous residents from Plaistow who live along Kingston Road near Garland Way complained about late night truck traffic to and from the terminal. The town subsequently served a cease and desist order on Atlas and

the terminal owner, alleging a violation of a Town of Plaistow zoning ordinance that reads in pertinent part:

> Any uses that may be obnoxious or injurious by reason of the production or emission of odors, dust, smoke, refuse matter, fumes, noise, vibration or other similar conditions, or that are dangerous to the comfort, peace, enjoyment, health or safety of the community, whether it contributes to its disturbance or annoyances are prohibited in all districts.

The cease and desist order stated that "heavy commercial trucking arriving at and leaving [the] site is emitting odors, smoke, fumes, noise and vibration around the clock." Despite the order, late night traffic to and from the terminal continued.

The town then brought an action in New Hampshire Superior Court seeking an injunction against the terminal and an order imposing reasonable hours of operation. The state court entered a preliminary injunction on February 28, 1989, placing a curfew on night-time access to and from the terminal. After an evidentiary hearing, the court entered a permanent injunction on July 7, 1989, limiting the terminal's night-time traffic as follows:

> 6:00 a.m. to 9:00 p.m.: No restrictions.
>
> 9:00 p.m. to 11:00 p.m.: Two trucks may arrive or depart.
>
> 11:00 p.m. to 5:00 a.m.: No trucks may arrive or depart.
>
> 5:00 a.m. to 6:00 a.m.: Three trucks may arrive or depart.

The New Hampshire Supreme Court denied the terminal's request for appellate review.

On March 26, 1993, appellants filed a federal suit against the town, alleging that the enforcement of the Plaistow zoning ordinance was preempted by various federal statutes and by the Commerce Clause. U.S. Const., Art. I, § 8. On October 25, 1993, the district court granted the town's motion to dismiss, for failure to state a claim, the appellants' claim that the injunction was preempted by the Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.* *New Hampshire Motor Transport Ass'n v. Town of Plaistow*, 836 F.Supp. 59 (D.N.H.1993).

A three-day bench trial followed in August 1994. Thereafter, the district court ruled that the injunction limiting night-time access to and from the trucking terminal was not preempted by two other federal statutes invoked by the appellants—the Surface Transportation Assistance Act of 1982, 49 U.S.C. § 31101 *et seq.*, and the Hazardous Materials Transportation Uniform Safety Act of 1990, 49 U.S.C. § 5101 *et seq.*—and did not violate the Commerce Clause. This appeal followed. We agree with the district court's determinations and affirm.

■ 1. The town urges that the district court judgment be upheld, without reaching the merits, on the ground that the state court enforcement action is *res judicata* as to all of the appellants. The reach of a prior state court judgment is determined by state law. *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Under New Hampshire law, we think that the prior judgment does not foreclose the present suit, at least by appellants who were not parties to the state court action.

■ The only defendants in the state court action were the terminal owner and its operator. Non-parties can be bound where they are in privity with parties to prior litigation, and the privity concept is fairly elastic under New Hampshire law, as elsewhere. But normally something more is required for privity between the prior and present litigants than merely a common interest in the outcome. *Daigle v. City of Portsmouth,* 129 N.H. 561, 534 A.2d 689, 694 (1987). *See also Gonzalez v. Banco Cent. Corp.,* 27 F.3d 751, 756–63 (1st Cir.1994) (interpreting federal law).

■ Here, there is no indication that the appellant interstate carriers even knew of, let alone controlled, the prior litigation. Although the town points out that the same law firm represents all of the appellants, the interstate carriers are not claimed to have controlled or managed the original state court litigation from behind the scenes. *Cf. Montana v. United States,* 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979); *General Foods v. Massachusetts Dept. of Pub. Health,* 648 F.2d 784, 789 (1st Cir.1981).

It is also plain that the interstate carriers who use the terminal on a regular basis have a real and distinct interest in nullifying the town's restriction.

Finally, we note that with the exception of the Commerce Clause issue, the federal issues were apparently not litigated in the state court. This would not necessarily defeat a valid claim of *res judicata, see, e.g., Stuhlreyer v. Armco, Inc.*, 12 F.3d 75, 77 (6th Cir.1993), but it encourages us to resolve any doubts in favor of allowing the carriers to sue. Since the merits must be reached on the appeals by the interstate carriers, we need not consider the stronger claim of foreclosure against the owner and operator of the terminal.

2. Turning to the merits, our review of the district court's preemption analyses is plenary, *Ellenwood v. Exxon Shipping Co.*, 984 F.2d 1270, 1273 n. 4 (1st Cir.), *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 2987, 125 L.Ed.2d 682 (1993), and we address in turn each of the statutes relied on by appellants as a separate ground for preemption. Among these, the most important is the Surface Transportation Assistance Act of 1982 ("the Surface Act"), as amended by the Tandem Truck Safety Act of 1984 ("the Tandem Act"), now codified at 49 U.S.C. § 31111 *et seq.* These statutes together establish uniform, national standards for the maximum size and weight of trucks and trailers used in interstate commerce.

As amended, the Surface Act forbids the states from enacting or enforcing laws that prohibit trucks and trailers of approved length and weight from travelling on the national network, *i.e.*, the system of interstate highways and other federally-funded primary routes designated by the Secretary of Transportation. 49 U.S.C. § 31111(e); 23 C.F.R. § 658.5. The Surface Act also prohibits states from denying approved trucks and trailers "reasonable access" between the national network and "terminals." 49 U.S.C. § 31114. This provision, which is at the heart of this case, reads as follows:

§ 31114. Access to the Interstate System

(a) Prohibition on denying access. A State may not enact or enforce a law denying to a commercial motor vehicle subject to this subchapter or subchapter I of this chapter reasonable access between—

(1) the Dwight D. Eisenhower System of Interstate and Defense Highways (except a segment exempted under section 31111(f) or 31113(e) of this title) and other qualifying Federal-aid Primary System highways designated by the Secretary of Transportation [*i.e.*, the national network]; and

(2) terminals, facilities for food, fuel, repairs, and rest, and points of loading and unloading for household good carriers, motor carriers of passengers, or any truck tractor-semitrailer combination in which the semitrailer has a length of not more than 28.5 feet and that generally operates as part of a vehicle combination described in section 31111(c) of this title.

(b) Exception.—This section does not prevent a State or local government from imposing reasonable restrictions, based on safety considerations, on a truck tractor-semitrailer combination in which the semitrailer has a length of not more than 28.5 feet and that generally operates as part of a vehicle combination described in section 31111(c) of this title.

The district court ruled that the local curfew did not deny reasonable access to trucks wishing to use the Atlas terminal. The terminal is located between five and six miles from Interstate 495, the nearest juncture with the national network. (Route 125 in Plaistow is not a part of the national network. *See* 23 C.F.R. § 658, app. A (New Hampshire.)) Given this distance, and Plaistow's legitimate interest in curbing noise, odor and dust in its residential areas, the district court found that the night-time restrictions were a reasonable compromise.

On this appeal, the truckers first say that the "reasonable access" provision limits state restrictions to those based on safety. This is a straightforward issue of statutory construction which, absent the "exception" clause quoted above, would easily be resolved in the town's favor. After all, the main provision requires "reasonable access." 49 U.S.C. § 31114(a). "Reasonable" is a comprehensive term, *United States v. Rodriguez–Mor-*

*ales,* 929 F.2d 780, 785 (1st Cir.1991), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992), and nothing in language or common-sense makes reasonableness turn solely on safety considerations.

Context reenforces this view. The "[p]rohibition on denying access," 49 U.S.C. § 31114, extends far beyond the operation of interstate highways or federally funded state roads that are designated parts of the national network. Local roads and other facilities are also covered by the provision to the extent needed to assure reasonable access to the national network. 23 C.F.R. § 658.19. The guarantee of reasonable access thus has a formidable reach, extending to local regulatory measures that operate miles away from any interstate or national network highway.

Many of these measures are designed to safeguard interests other than safety. Consider, for example, a restriction that routed heavy traffic on a detour of a few miles to assure quiet in a hospital zone. It is difficult to conceive that Congress meant to exclude such a concern from the calculus used to determine whether a restriction infringes on "reasonable access" to the federal highway system. In this instance, language and policy are as one in opposing such a restrictive reading.

█ The sole argument for limiting the restrictions to safety matters stems from the exception provision, now codified as 49 U.S.C. § 31114(b). As a matter of language, this provision permits, but does not compel, a negative inference that the only restrictions allowed under the main provision are safety restrictions. Because subsections (a) and (b) do not fit neatly together, it is difficult to be absolutely certain of Congress' intent. But for several reasons we reject the suggestion that subsection (b) narrows by inference the concept of reasonableness in subsection (a).

First, the negative inference is flawed as a matter of language. By its terms the safety exception in subsection (b) is concerned not with safety limitations generally but with restrictions on truck tractor-semitrailer combinations. If the exception were taken to narrow the restrictions permitted under the main "reasonable access" provision, then arguably the *only* restrictions allowed would be safety restrictions directed to truck tractor semitrailer combinations, an extremely odd result.

Second, the original 1982 Surface Act contained the reasonable access language with *no* exception provision; so nothing in 1982 suggested that state access restrictions were limited to those based on safety.[1] If Congress in 1984 had intended to alter the reasonable access provision so as to limit the states to safety restrictions, one might reasonably expect some indication of this purpose at least in the legislative history. *Cf. Sierra Club v. Secretary of Army,* 820 F.2d 513, 522 (1st Cir.1987). Congress' failure to indicate any such purpose argues against appellants' reading. *Compare* S.Rep. No. 505, 98th Cong., 2d Sess. 1–3 (1984) U.S.Code Cong. & Admin.News 1984, pp. 4769–4771.

The truth is that the legislative history of the exception provision is meager. *See New York State Motor Truck Ass'n v. City of New York,* 654 F.Supp. 1521, 1533 (S.D.N.Y.1987), *aff'd* 833 F.2d 430 (2d Cir.1987) (quoting two rather uninformative sentences). Among other changes in 1984, Congress expanded somewhat the protected radius in which truck tractor-semi-trailers could operate to include their points of loading and unloading. Since this was a concern to state officials, S.Rep. No. 505 at 1–3; 654 F.Supp. at 1531, Congress evidently balanced this change by adding subsection (b) as a counter-weight.

We appreciate that, as appellants point out, three district courts have made references to the "reasonable access" provision as one directed to safety.[2] But the state re-

---

1. Section 412 of the Surface Act, 96 Stat. at 2160, provided:

 No State may enact or enforce any law denying reasonable access to commercial motor vehicles subject to this title between (1) the Interstate and Defense Highway System and any other qualifying Federal-aid Primary System highways as designated by the Secretary,

 and (2) terminals, facilities for food, fuel, repairs, and rest, and points of loading and unloading for household goods carriers.

2. *A.B.F. Freight System, Inc. v. Suthard,* 681 F.Supp. 334, 341 (E.D.Va.1988); *New York State Motor Truck,* 654 F.Supp. at 1539; *Consolidated Freightways Corp. of Delaware v. Larson,* 647

strictions with which those cases were concerned were wholly different from and far more intrusive than the Plaistow ordinance and order, including blanket limitations on the distance vehicles could freely travel off the national network and burdensome prior approval provisions for the use of local roads. *See* 681 F.Supp. at 339–40; 654 F.Supp. at 1529–30; 647 F.Supp. at 1484–88. Safety is obviously a paramount reason for limiting access; but, in our view, it is not the only reason permitted by Congress.

■ Having concluded that the district court correctly construed the Surface Act, we have no occasion to review the court's further, fact-specific decision that the Plaistow restrictions in this case did permit reasonable access. The appellants scarcely bother to argue the point; in a couple of sentences, they simply assert that the district court findings show that a truck terminal must operate 24 hours a day. The opinion does not make such a finding, and we think appellants' cursory argument waives the factual issue in this case. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

3. The truckers next contend that the curfew violates the Hazardous Materials Transportation Uniform Safety Act of 1990 ("the Materials Act"), 49 U.S.C. § 5101 *et seq.* The Materials Act establishes uniform, national rules for the transportation of hazardous materials and, together with its accompanying regulations, creates an elaborate scheme for the designation, handling, packaging, labeling, and shipping of hazardous materials. Like the Surface Act, the Materials Act contains an express preemption clause, which reads in relevant part as follows:

§ 5125. Preemption

(a) General.—Except as provided in subsections (b), (c), and (e) of this section and unless authorized by another law of the United States, a requirement of a State, political subdivision of a State, or Indian tribe is preempted if—

(1) complying with a requirement of the State, political subdivision, or tribe and a requirement of this chapter or a regulation prescribed under this chapter is not possible; or

(2) the requirement of the State, political subdivision, or tribe, as applied or enforced, is an obstacle to accomplishing and carrying out this chapter or a regulation prescribed under this chapter.

The truckers contend that the curfew is preempted by the second provision of the general preemption clause, because it interferes with "the federal speedy-transport mandate," *N.H. Motor Transport Ass'n v. Flynn*, 751 F.2d 43, 51 (1st Cir.1984), codified at 49 C.F.R. § 177.853(a): "[a]ll shipments of hazardous materials shall be transported without unnecessary delay, from and including the time of commencement of the loading of the cargo until its final discharge at destination." Much of the Plaistow freight is classified as hazardous. Because the Plaistow curfew necessarily entails a delay for hazardous materials, the truckers say that it violates the Materials Act.

By using the word "unnecessary," the regulations indicate that some delays are necessary and acceptable. *See National Tank Truck Carriers, Inc. v. City of New York*, 677 F.2d 270, 275 (2d Cir.1982) (construing prior version of statute). Once again, appellants make little effort to show that on the present record the specific curfew requirements imposed by Plaistow create any risk to the drivers of the trucks, other highway traffic, Plaistow or any other community. The substance of the appellants' brief on appeal is that any regime that creates a possibility of a 12–hour delay in delivery *ipso facto* automatically imposes "unnecessary" delay.

■ A general, state-wide restriction is obviously more vulnerable to attack both because its impact is likely to be much greater and because it treats alike all situations regardless of need or danger. *See A.B.F. Freight System*, 681 F.Supp. at 345. Quite possibly a local restriction might also unjustifiably interfere with hazardous shipment

F.Supp. 1479, 1483–84 (M.D.Pa.1986), *rev'd on other grounds*, 827 F.2d 916 (3d Cir.1987), *cert.*

*denied*, 484 U.S. 1032, 108 S.Ct. 762, 98 L.Ed.2d 775 (1988).

movements, either standing alone or in combination with restrictions in other communities. But the burden is upon those who attack the restriction to show the impact. At least on this appeal, appellants have not even attempted a serious fact-specific showing.

This case is quite unlike *National Tank Truck Carriers, Inc. v. Burke,* 698 F.2d 559 (1st Cir.1983), in which we affirmed a decision striking down Rhode Island's state-wide curfew and permitting procedure for transporting certain liquid gas on any Rhode Island roadway. By contrast, the curfew at issue here involves one terminal, is tailored to specific local conditions, and imposes no time restriction on the delivery of hazardous materials in New Hampshire so long as the Plaistow terminal is not used as a point of interchange.

4. The truckers also challenge the district court's dismissal of their claim under the Noise Control Act of 1972 ("the Noise Act"), 42 U.S.C. § 4901 *et seq.* 836 F.Supp. at 67–68. That statute created a federal regulatory scheme to set noise emission levels for motor carriers engaged in interstate commerce. Because the curfew was imposed in part to eliminate the noise caused by trucks, the truckers say that it is preempted by the Noise Act.

 The federal noise regulations pertaining to motor carriers do nothing more than set minimum and maximum decibel levels and exhaust system and tire standards for trucking equipment that may operate on public roadways. 40 C.F.R. §§ 202.20–202.23. Accordingly, no state or town may set different decibel levels for motor carriers operating within its jurisdiction. But neither the Plaistow curfew order nor the ordinance it enforces purports to regulate the decibel levels, exhaust systems, or tires of individual trucks. Rather, noise levels were one element of an equation that also included "odors, dust, smoke, refuse matter, fumes ... and vibration" and that prompted a limitation on operating hours for one specific site.

The Noise Act preemption clause underscores the limited reach of that statute. It provides in relevant part as follows:

[A]fter the effective date of a regulation under this section applicable to noise emissions resulting from the operation of any motor carrier engaged in interstate commerce, no State or political subdivision thereof may adopt or enforce any standard applicable to the same operation of such motor carrier, unless such standard is identical to a standard applicable to noise emissions resulting from such operation prescribed by any regulation under this section.

42 U.S.C. § 4917(c)(1). Admittedly, the statutory language is general ("any standard applicable to the same operation"); but we think that it would stretch the words beyond their ordinary meaning to strike down a local curfew order based on a range of concerns where federal law regulates only the decibel levels of the equipment. The Noise Act was not designed to remove all state and local control over noise; on the contrary, the statute says that "primary responsibility for control of noise rests with State and local governments...." 42 U.S.C. § 4901(a)(3).

5. Finally, appellants argue that the Plaistow curfew is preempted under the Commerce Clause itself even if it does not offend any of the individual statutes relied upon by appellants. Since Congress has enacted its own legislative test for this case ("reasonable access"), one might ask whether it is proper for the courts to resort separately to the more general Commerce Clause rubrics. *Cf. White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1993). Be that as it may, applying the general Commerce Clause tests does not alter the result.

 Absent any statute at all, the courts ask—in a case not involving discrimination against interstate commerce—whether "the burden [on interstate commerce imposed by the local restriction] is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The district court found no violation in this case. Even if we reviewed this fact-specific legal determination *de novo, cf. Bose Corp. v. Consumers Union of United States, Inc.,* 466

U.S. 485, 501 & n. 17, 104 S.Ct. 1949, 1959–60 & n. 17, 80 L.Ed.2d 502 (1984), our conclusion would be the same.

Starting with "burden," in this case a night-time curfew prevents arrivals and departures at one terminal, at one location in the state, during six late-night hours (from 11 p.m. to 5 a.m.) with lesser restrictions for three hours (from 5 a.m. to 6 a.m. and from 9 p.m. to 11 p.m.). For 15 hours of the day (from 6 a.m. to 9 p.m.), there are *no* limitations. The curfew does disadvantage this terminal *vis-a-vis* other terminals not so restricted, and somewhat impairs its profits; but the magnitude of the disadvantage is not easy to isolate.

The evidence showed that customers often want early morning delivery, and in some cases the curfew does limit the ability of the Plaistow/Newton terminal to make such deliveries. On the other hand, there is no indication that customers cannot be served from other terminals or that the flow of commerce into and out of New Hampshire is seriously affected. No state wide restriction is involved, *compare Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981), nor is a major artery of commerce severely constricted, *compare Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

On the other side of the scale, the impact on local residents is not some remote or conjectural specter. The curfew order was obtained only because of local experience with the terminal; and residents testified at trial about the effect on their lives of unrestricted deliveries. The curfew is akin to zoning and traffic restrictions traditionally applied on a local level, *cf. Christensen v. Yolo Cty. Bd. of Supervisors,* 995 F.2d 161, 166 (9th Cir.1993); *Interstate Towing Ass'n, Inc. v. Cincinnati,* 6 F.3d 1154, 1163–65 (6th Cir.1993), and there is no regulation by federal authorities that provides substitute protection.

■ In sum, the burden of the curfew on interstate commerce has not been shown to be excessive in relation to the benefits. Congress has great latitude to order preemption, and calibrate it with precision, based on a legislative judgment that local regulation threatens interstate commerce. The dormant Commerce Clause, by contrast, is a fairly blunt instrument; and absent discrimination, courts may reasonably insist on a fairly clear showing of undue burden before holding unconstitutional a traditional example of local regulation. *See Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 443–44, 98 S.Ct. 787, 795–96, 54 L.Ed.2d 664 (1978). That showing has not been made on the record before us.

*Affirmed.*

### ORDER ON PETITION
### FOR REHEARING

Oct. 25, 1995.

On petition for rehearing, New Hampshire Motor Transport Association has expanded its reliance on an agency regulation touched upon lightly at one point in the original brief. This regulation of the Department of Transportation states that access review processes adopted by the state shall provide *inter alia* for "denial of access to terminals ... only on the basis of safety and engineering analysis of the access route." 23 C.F.R. § 658.19(i)(2)(A). It is apparently the Association's position that this provision represents a controlling agency interpretation of the "reasonable access" provision of the Surface Transportation Systems Act of 1982 to which deference is required under the *Chevron* doctrine. We reject this belated suggestion.

First, the ordinance and order in this case do not "deny ... access to the terminal"; they impose reasonable restrictions upon it, as the statute itself clearly permits. This is no more an outright *denial* of access than a detour around a school zone or a bridge raised for maritime commerce during rush hour. Nor does the regulation itself even purport to define "reasonable access" as that term is used in the statute; the quoted provision is one element in a check list of elements for state review processes to be established under the regulations.

Indeed, if the regulation were read as the Association intends, there would be a very

**334**

serious question about its validity. As explained in the panel opinion, the original 1982 statute did not even arguably impose the requirement that all reasonable restrictions on access be based solely on safety; and whatever the precise purpose of the 1984 amendment that emphasized that safety regulations could be imposed on certain tractor-trailers, a drastic recasting of the original "reasonable access" provision is nowhere suggested. Even under *Chevron,* deference to an administrative interpretation is not unlimited.

Second, the implications of the suggested reading of the regulation, like the suggested reading of the statute, weigh heavily against it. There is no federal regime of zoning or use restrictions that applies to terminals, like the one in this case, located miles from the interstate highway system. Thus, the Association's reading of the statute and the regulation would mean that no one—neither the federal government, nor the states and localities—would have the power to carry on this traditional function of government.

It would be remarkable enough for Congress to determine to transfer such authority *sub silentio* from the states and local governments to federal authorities or for it to empower the Department of Transportation to make such a shift by regulation. What is to us almost inconceivable is that Congress effectively abolished *anyone*'s authority to impose reasonable non-safety based restrictions on access to such terminals. The notion that trucking terminals have been completely exempted from regulation that affects every other kind of business in the United States is difficult to take seriously.

The petition for rehearing is *denied.*