United States Court of Appeals
For the First Circuit


No. 96-1548

COMMONWEALTH OF MASSACHUSETTS,

Plaintiff, Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION 

and

FEDERAL DEPOSIT INSURANCE CORPORATION,

as Receiver for Bank Five for Savings, et al.,

Defendants, Appellees.



ERRATA SHEET ERRATA SHEET

The opinion of this Court issued on December 19, 1996, is
amended as follows:

On page 2, third line from the bottom, the citation to
1821(a)(2)(B)(5), (6) should read 1821(a)(5), (6).

United States Court of Appeals
For the First Circuit


No. 96-1548
COMMONWEALTH OF MASSACHUSETTS,

Plaintiff, Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION 

and

FEDERAL DEPOSIT INSURANCE CORPORATION,

as Receiver for Bank Five for Savings, et al.,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge] 



Before

Selya, Cyr and Lynch, Circuit Judges. 


Thomas O. Bean, Assistant Attorney General, with whom Scott 
Harshbarger, Attorney General of Massachusetts, was on brief, for 
appellant.
Mitchell E.F. Plave, Counsel, with whom Ann S. DuRoss, 
Assistant General Counsel, and Colleen B. Bombardier, Senior 
Counsel, were on brief for appellee FDIC, in its corporate 
capacity.
Leslie Randolph, Counsel, with whom Ann S. DuRoss, Assistant 
General Counsel, and Robert D. McGillicuddy, Senior Counsel, were 
on brief for appellee FDIC, as Receiver for Bank Five for
Savings, et al.

December 19, 1996


LYNCH, Circuit Judge. Against the backdrop of a LYNCH, Circuit Judge. 

general economic decline and tightened federal bank

regulations, Massachusetts suffered forty-eight bank failures

between 1987 and 1994. This case is part of the aftermath of

that financial crisis. At issue is whether the Commonwealth

of Massachusetts, acting under its abandoned property

statute, may obtain either the federal deposit insurance

proceeds or the pro rata distributions from abandoned

accounts in failed Massachusetts banks. Considerable sums

are at stake.

I.

The Federal Deposit Insurance Corporation was

created by the Banking Act of 1933, Pub. L. No. 73-66, 8,

48 Stat. 162, to alleviate hardships caused by bank failures.

See S. Rep. No. 584, 72d Cong., 1st Sess. 10 (1932).1 The 

agency in its corporate capacity ("FDIC-Corporate") offers

insurance on depositors' accounts for up to $100,000. 12

U.S.C. 1821(a)(1)(B). Participating banks and thrifts pay

premiums to the FDIC. Those premiums are used to maintain

two insurance funds, the Bank Insurance Fund and the Savings

Association Insurance Fund. Id. 1821(a)(5), (6). When a 

 

1. The Banking Act of 1933 amended the Federal Reserve Act,
Pub. L. No. 63-43, 38 Stat. 251 (1913). Congress revisited
the deposit insurance provisions in 1935, and again in 1950,
when these provisions were amended and made part of the
Federal Deposit Insurance Act ("FDIA"), Pub. L. No. 81-97, 
2(1), 64 Stat. 873.

-2- 2

bank fails, FDIC-Corporate draws money from one of these

funds and either pays the insurance proceeds directly to

depositors as an insured deposit or transfers the money to a

new bank as a transferred deposit, using whichever method is

more cost effective. Id. 1821(f). Upon payment to the 

depositors, FDIC-Corporate becomes subrogated to the

depositors' rights against the failed banks. Id.  

1821(g)(1).

The FDIC acting as a receiver ("FDIC-Receiver")

winds up the affairs of failed banks and distributes any

remaining assets pro rata to the bank's creditors. Id.  

1821(c)(2)(A)(ii); 1821(d)(11)(A). FDIC-Corporate may bring

a claim against FDIC-Receiver for the insured depositors' pro

rata shares of any distributed liquidated assets. See id. 

1821(g)(1).

Before 1988, FDIC-Corporate had generally honored

claims by states, pursuant to their abandoned property acts,

for the insured value of abandoned deposits at failed banks.2

Treatment of Abandoned Deposits and Property in Failed 

Depository Institutions: Hearing Before the Subcomm. on 

Financial Institutions Supervision, Regulation and Insurance 

of the House Comm. on Banking, Finance and Urban Affairs, 

 

2. "States as sovereigns may take custody of or assume title
to abandoned personal property as bona vacantia, a process
commonly (though somewhat erroneously) called escheat."
Delaware v. New York, 507 U.S. 490, 497 (1993). All 50 
states have statutes providing for such "escheat."

-3- 3

102d Cong., 2d Sess. 149 (1992) (Letter of Alice C. Goodman,

Acting Director, Office of Legislative Affairs, FDIC). FDIC-

Receiver continues to permit states that file timely claims

pursuant to the provisions governing general creditors of the

receivership estate to act on behalf of absent depositors and

to claim those depositors' pro rata shares of any distributed

liquidated assets. Id. at 95 (Testimony of Alfred J.T. 

Byrne, General Counsel, FDIC). However, after 1988, FDIC-

Corporate began declining to pay states the insured value of

abandoned accounts. Id. at 97-98. FDIC-Corporate asserted 

that its original policy was inconsistent with the plain

language of the pre-1993 version of 12 U.S.C. 1822(e),

which provided that insurance funds not claimed by a

depositor within eighteen months of the appointment of a

receiver reverted back to the FDIC. Id; see also 12 U.S.C.  

1822(e) (1989) (current version enacted 1993).

The states, with Massachusetts in the vanguard,

fought back. They lobbied Congress, leading to the enactment

of compromise legislation, the Unclaimed Deposits Amendments

Act of 1993 ("UDAA"), Pub. L. No. 103-44, 107 Stat. 220

(1993), under which the states receive the insured value of

abandoned deposits for a 10-year period. If a depositor

fails to make a claim during this time, the insurance

proceeds on the abandoned account must be returned to the

-4- 4

FDIC and all rights of the depositor are extinguished. 12

U.S.C. 1822(e)(5); see infra note 7. 

However, the UDAA expressly made the former version

of 1822(e) applicable to banks placed in receivership

between January 1, 1989 and June 28, 1993, with one

additional proviso. Claims by insured depositors at such

banks made prior to the termination of the receivership

estate are not time-barred. Pub. L. No. 103-44, 2(b)

(1993). Thus, depositors at banks placed in receivership

between January 1, 1989 and June 28, 1993 have the longer of

eighteen months or until the termination of the receivership

estate to file claims with FDIC-Corporate for the insured

value of their accounts. Id. 

Massachusetts also turned to the federal judicial

system for redress, claiming it is entitled to the insurance

proceeds and the pro rata distributions from abandoned

deposits in thirty-three failed Massachusetts banks for

which the FDIC was appointed receiver between May 1990 and

December 1992.3

II.

The Commonwealth has its own comprehensive legal

framework, the Massachusetts Abandoned Property Act

("MAPA"), Mass. Gen. L. ch. 200A, for dealing with abandoned

 

3. At least one similar suit, Resolution Trust Corp. v. 
California, 851 F. Supp. 1453 (C.D. Cal. 1994), has also been 
brought in federal court.

-5- 5

property. The federal government has a similarly intricate

statutory and regulatory scheme relating to bank failures.

The dispute between the Commonwealth and the FDIC involves

the intersection of these two bodies of law.

The MAPA was enacted both to protect the rights of

true owners when and if they appear and to bring additional

revenues to the Commonwealth's treasury. Treasurer & 

Receiver Gen. v. John Hancock Mut. Life Ins. Co., 446 N.E.2d 

1376, 1383 (Mass. 1983). It creates a presumption that

deposits are abandoned unless the owner has, during the past

three years, either communicated with the deposit holder or

engaged in certain other activities. Mass. Gen. L. ch. 200A,

3. Deposit holders, including banks, are required to

submit annual reports to the State Treasurer listing the

names and addresses of depositors deemed to have abandoned

accounts valued at more than $100. Id. 7. The banks must 

send letters to the owners of such accounts at least sixty

days before filing the report, giving notice that the

deposits are about to be surrendered to the custody of the

Commonwealth. Id. 7(A). 

Unless a depositor claims an abandoned account, the

bank must deliver the funds into the custody of the State

Treasurer, who publishes a notice that the accounts are

deemed abandoned. Id. 8A, 8. The money is then placed in 

an Abandoned Property Fund and used for the benefit of the

-6- 6

Commonwealth. Id. 9(e). The owner of an abandoned account 

has an unlimited period to submit a claim for the funds. Id. 

10(a). If the State Treasurer determines that the claim is

valid, the owner receives the value of the account plus a

small amount of monthly interest.4 Id. 10(e). However, 

only about 25% of abandoned accounts are ever claimed; the

rest are retained by the Commonwealth.

The dispute over deposits held in failed banks and

deemed abandoned under the MAPA arose in early 1992.5

Following unsuccessful attempts to achieve a settlement,

Massachusetts filed a complaint against FDIC-Receiver in

federal district court in January 1994 seeking the pro rata

value of the deposits from the failed banks' remaining

assets. In March 1994, Massachusetts also filed an

administrative claim with FDIC-Corporate for the insured

value of the unclaimed deposits, arguing that it was entitled

to these funds under the MAPA.6

 

4. This interest cannot exceed five-twelfths of one percent
per month. Id. 

5. This dispute initially involved both pre-closing
deposits, deposits abandoned before the banks were put into
receivership, and post-closing deposits, deposits abandoned
after the banks were put into receivership. However,
Massachusetts has since conceded that it is not entitled to
the post-closing deposits, Massachusetts v. FDIC, 916 F. 
Supp. 54, 57 (D. Mass. 1996), and so the term "deposits" here
refers to pre-closing deposits only.

6. The Commonwealth is not attempting to recover the same
money twice: it only seeks the uninsured value of the pre-
closing deposits from FDIC-Receiver to the extent that it

-7- 7

FDIC-Corporate rejected the claim, stating that the

MAPA was pre-empted by 12 U.S.C. 1822(e) (1989) (current

version enacted 1993).7 Massachusetts petitioned this court

directly for review of the administrative claim. This court

 

does not recover the insured value of these deposits from
FDIC-Corporate.

7. The pre-amendment version, the operative text here,
stated:

(e) Unclaimed deposits. If, after 
the Corporation shall have given at least
three months' notice to the depositor by
mailing a copy thereof to his last-known
address appearing on the records of the
depository institution in default, any
depositor in the depository institution
in default shall fail to claim his
insured deposit from the Corporation
within eighteen months after the
appointment of the receiver for the
depository institution in default, or
shall fail within such period to claim or
arrange to continue the transferred
deposit with the new bank or with the
other insured depository institution
which assumes liability therefor, all
rights of the depositor against the
Corporation with respect to the insured
deposit, and against the new bank and
such other insured depository institution
with respect to the transferred deposit,
shall be barred, and all rights of the
depositor against the depository
institution in default and its
shareholders, or the receivership estate
to which the Corporation may have become
subrogated, shall thereupon revert to the
depositor. The amount of any transferred
deposits not claimed within such eighteen
months' period, shall be refunded to the
Corporation.

12 U.S.C. 1822(e) (1989) (amended 1993).

-8- 8

held that it lacked jurisdiction and transferred the case to

the district court for a ruling on the merits. Massachusetts 

v. FDIC, 47 F.3d 456, 457 (1st Cir. 1995) (initial 

jurisdiction to hear appeals from the FDIC's disposition of

claims for insurance benefits lies not in the court of

appeals, but in the district court). The cases against FDIC-

Corporate and FDIC-Receiver were consolidated in October 1995

by agreement of the parties.

FDIC-Corporate moved to dismiss, reasserting that

the MAPA is pre-empted by federal statute. FDIC-Corporate

moved in the alternative for summary judgment, arguing that

its decision to deny Massachusetts' claim was a proper

exercise of discretion. At the same time, FDIC-Receiver

moved to dismiss on the ground that Massachusetts' claim for

deposit funds was time-barred because it had not been filed

within the 90-day period for general creditors set forth in

12 U.S.C. 1821(d)(5). Massachusetts responded with a

motion for summary judgment against FDIC-Corporate.

Massachusetts v. FDIC, 916 F. Supp. at 57. 

The district court, in a carefully reasoned

opinion, dismissed the insurance claim against FDIC-Corporate

and entered summary judgment for FDIC-Receiver on the

creditor claim. Id. at 61.8 The allowance of both motions 

 

8. FDIC-Receiver's motion to dismiss was treated as a motion
for summary judgment, because the parties asked that
materials outside the pleadings be considered. Id. at 60 

-9- 9

is reviewed de novo. Villafane-Neriz v. FDIC, 75 F.3d 727, 

730 (1st Cir. 1996); Heno v. FDIC, 20 F.3d 1204, 1205 (1st 

Cir. 1994). We affirm.

III.

The Commonwealth argues two bases for its claim

against FDIC-Corporate for the insured value of deposits

abandoned in failed Massachusetts banks: its abandoned

property statute and FDIC regulations. The claim raises

certain issues. The first is how properly to interpret the

relevant version of 12 U.S.C. 1822(e). The second is

whether this federal statute pre-empts the MAPA. If it does,

the question becomes whether the Commonwealth is nonetheless

entitled to the insurance proceeds under any other provision

of federal law.

A. Statutory Construction 

The Supreme Court has instructed that the first

task in statutory construction is to separate "the question

of the substantive (as opposed to pre-emptive) meaning of a

statute [from] the question of whether a statute is pre-

emptive." Smiley v. Citibank, 116 S. Ct. 1730, 1735 (1996). 

FDIC-Corporate's primary argument is that the applicable

version of 1822(e) reflects a clear congressional intent

that insurance proceeds for abandoned accounts revert to one

of the FDIC insurance funds. FDIC-Corporate also asserts

 

(citing Fed. R. Civ. P. 12(c)).

-10- 10

that its interpretation of the statute is entitled to

deference under Chevron v. Natural Resources Defense Council, 

Inc., 467 U.S. 837 (1984). 

The Commonwealth counters that 1822(e) can hardly

be read as demonstrating a clear congressional intent that

the insurance recoveries referable to abandoned accounts

revert to the FDIC when the agency itself applied a contrary

interpretation between 1950 and 1988. Massachusetts further

argues that, in this context, the new FDIC interpretation is

not entitled to full Chevron deference. FDIC-Corporate 

concedes that before 1988 it did not consistently require

deposit insurance on abandoned accounts to be returned to the

federal government rather than turned over to the states.9

It asserts, however, that, when the inconsistency was brought

to its attention in late 1988, it determined that 1822(e)

required these funds to revert to the FDIC. Hearing, supra, 

at 97-98 (Testimony of Alfred J.T. Byrne, General Counsel,

FDIC).

 

9. This inconsistency may have resulted from the FDIC's use
of three different responses to bank failures, one of which
was known as a purchase and assumption transaction and did
not involve either insured deposits or transferred deposits,
and thus did not implicate 1822(e). In mid-1989, the FDIC
modified the structure of its purchase and assumption
transactions so that they made use of transferred deposits,
thus eliminating this source of confusion. Hearing, supra, 
at 97-98 (Testimony of Alfred J.T. Byrne, General Counsel,
FDIC).

-11- 11

When determining the substantive meaning of a

statute, "[f]irst, always, is the question of whether

Congress has directly spoken to the precise question at

issue." Chevron, 467 U.S. at 842. Here, the parties frame 

the issue as whether a state, acting under its abandoned

property statute, may "claim" the insured value of abandoned

deposits held in failed banks. The crux of the matter,

however, is whether a state acting on behalf of absent

depositors may itself qualify as a depositor under 1822(e).

We do not believe the plain language of 1822(e) answers

this question. That the FDIC apparently viewed the matter in

inconsistent ways reinforces this conclusion. Other indicia

of the statute's meaning, particularly the legislative

history, thus come into play. Wilson v. Bradlees, 96 F.3d 

552, 555 (1st Cir. 1996).

The Commonwealth's claim arises not under 1822(e)

as it was originally enacted in the 1935 amendments to the

Banking Act of 1933, but under the "reenactment" of 1822(e)

in 1993 as part of the UDAA.10 Consequently, we must

 

10. We use the term "reenactment" as a convenient shorthand.
Section 2(b) of the UDAA states:

Special rule for receiverships in 
progress.--Section 12(e) of the Federal 
Deposit Insurance Act [subsec. (e) of
this section] as in effect on the day
before the date of enactment of this Act
[June 28, 1993] shall apply with respect
to insured deposits in depository
institutions for which the Corporation

-12- 12

consider two different bodies of legislative history, that of

the original version of 1822(e) from 1935 and that of the

UDAA.

The 1935 legislative history provides no guidance

on this issue. However, the proceedings leading to the

enactment of the UDAA do shed some light on the matter. At

the congressional hearings on the UDAA, two senior agency

officials testified as to the agency's post-1988

interpretation of 1822(e). Congress did not, however,

cause the new version of 1822(e) to apply to banks placed

in receivership between January 1, 1989 and June 28, 1993,

despite lobbying by the states.

Congress is often deemed to have adopted an

agency's interpretation of a statute when, knowing of the

agency interpretation, it reenacts the statute without

significant change. FDIC v. Philadelphia Gear Corp., 476 

U.S. 426, 437 (1986). The legislative history thus suggests 

 

was first appointed receiver during the
period between January 1, 1989 and the
date of enactment of this Act [June 28,
1993], except that such section 12(e)
[subsec. (e) of this section] shall not
bar any claim made against the
Corporation by an insured depositor for
an insured or transferred deposit, so
long as such claim is made prior to the
termination of the receivership.

Technically, then, Congress did not reenact the pre-1993
version of 1822(e), but rather caused it to apply to banks
placed into receivership between January 1, 1989 and June 28,
1993.

-13- 13

that Congress wanted unclaimed deposits in banks placed into

receivership during the relevant period to revert to the

FDIC. But FDIC-Corporate's argument that "[b]y enacting the

UDAA, Congress has erased any question that 1822(e)

requires unclaimed insurance benefits to be returned to the

FDIC" overstates the case. Congress may simply have chosen

not to enter the fray as to the past. While the legislative

history of the UDAA is instructive, it is not dispositive.

Congress' intent remains ambiguous. Accordingly, the

question of how much deference to accord the interpretation

advanced by FDIC-Corporate must be considered.

An agency's formal interpretation, through a

rulemaking or an adjudication, of a statute it administers,

is accorded what has come to be known as Chevron deference. 

Davis & Pierce, Administrative Law Treatise 3.5, at 119 (3d 

ed. 1994); see also Chevron, 467 U.S. at 842-43. Under 

Chevron, if a statute is ambiguous with respect to the 

contested issue, "the question for the court is whether the

agency's answer is based on a permissible construction of the

statute." Chevron, 467 U.S. at 843. Contrary to the 

Commonwealth's argument, an agency certainly does not lose

its entitlement to deference by changing its position on a

matter entrusted to it by Congress. Rust v. Sullivan, 500 

U.S. 173, 186 (1991). Indeed, Chevron itself involved a case 

where the agency changed its position in a formal rulemaking.

-14- 14

467 U.S. at 863-64. "[T]he whole point of Chevron is to 

leave the discretion provided by the ambiguities of a statute

with the implementing agency." Smiley, 116 S. Ct. at 1734. 

Less formal interpretations -- policy statements,

guidelines, staff instructions, and litigation positions --

are not accorded full Chevron deference. Davis & Pierce, 

supra, 3.5, at 119-20; see also Massachusetts v. Blackstone 

Valley Elec. Co., 67 F.3d 981, 991 (1st Cir. 1995) (agency's 

litigation position not entitled to Chevron deference).11 

Here, the change in policy regarding treatment of abandoned

deposits could not have been more informal. The new policy

was merely announced in a 1988 presentation by one of the

FDIC's staff attorneys at a conference of the National

Association of Unclaimed Property Administrators. FDIC-

 

11. Chevron involves a recognition that courts are poorly 
situated to make policy choices concerning the interpretation
of statutes whose enforcement is entrusted to administrative
agencies. Judges are not experts in the field, nor are they
part of either of the political branches. Davis & Pierce,
supra, 3.3, at 113-15. But commentators have also noted 
the possible anti-democratic implications of too much
deference to the administrative agencies. See, e.g., Farina, 
Statutory Interpretation and the Balance of Power in the 
Administrative State, 89 Colum. L. Rev. 452, 510-11 (1989). 
According full Chevron deference to FDIC-Corporate's 
position raises a similar concern. This case in the end
involves a dispute between a state and an administrative
agency of the federal government and, as well, questions
about the role Congress intended state law to play in a
federal scheme. Congress should not be lightly thought to
have wished such sensitive questions to be handled through
informal and unexplained "policies" of an executive branch
agency. The FDIC may, of course, choose to solve this
difficulty by engaging in more formal processes.

-15- 15

Corporate then proceeded to deny states' proofs of claim.

The agency did not even issue a formal statement of its

reasons for the change.

This is not to say that FDIC-Corporate's position

would be entitled to no deference. An established 

administrative practice interpreting a statute may be

entitled to deference even if not yet reduced to specific

regulation. Philadelphia Gear, 476 U.S. at 439. 

Additionally, less formal agency determinations may be

accorded something less than full Chevron deference. Davis 

& Pierce, supra, 3.5, at 122. 

In the end, however, we need not precisely

ascertain the amount of deference to give the FDIC's

interpretation of 1822(e), because the outcome would be

unaffected. FDIC-Corporate's reading of the provision

comports with the intent, suggested by the legislative

history of the UDAA, that the insured value of abandoned

accounts revert to the FDIC insurance funds, where these

resources can be used to defray the costs of future bank

failures. The states themselves pay nothing into the fund to

secure insurance for their citizens. Any payment to a state

is thus a windfall, a result at least in part at odds with

the purpose of the insurance system.12 The FDIC's position

 

12. Massachusetts responds that allowing it to receive the
insurance proceeds would advance the interests of depositors,
whose claims would never be extinguished under the MAPA.

-16- 16

is, in context, an eminently reasonable interpretation of the

statute.

B. Pre-emption 

The district court held that 1822(e) pre-empts

the MAPA with respect to the insured value of abandoned

deposits in failed banks. Our review of this decision is

plenary. New Hampshire Motor Transp. Ass'n v. Town of 

Plaistow, 67 F.3d 326, 329 (1st Cir. 1995), cert. denied, 116 

S. Ct. 1352 (1996).

As a general matter, the standards articulated in

Louisiana Public Service Commission v. FCC, 476 U.S. 355 

(1986), guide the inquiry into whether a federal provision

pre-empts state law:

Pre-emption occurs when Congress, in
enacting a federal statute, expresses a
clear intent to pre-empt state law, when
there is outright or actual conflict
between federal and state law, where
compliance with both federal and state
law is in effect physically impossible,
where there is implicit in federal law a
barrier to state regulation, where
Congress has legislated comprehensively,
thus occupying an entire field of
regulation and leaving no room for the
States to supplement federal law, or
where the state law stands as an obstacle
to the accomplishment and execution of

 

Under federal law, the claim is extinguished eighteen months
after the appointment of a receiver or at the termination of
the receivership estate, whichever occurs later. Pub. L. No.
103-44, 2(b) (1993). While the Commonwealth's statement
may be theoretically true, experience shows that the vast
majority of the funds are never claimed and so it is the
state that usually benefits.

-17- 17

the full objectives of Congress. Pre-
emption may result not only from action
taken by Congress itself; a federal
agency acting within the scope of its
congressionally delegated authority may
pre-empt state regulation.

Louisiana Pub. Serv. Comm'n, 476 U.S. at 368-69 (internal 

citations omitted).

The inquiry here has an additional layer of

complexity due to Massachusetts' assertion, based on Delaware 

v. New York, 507 U.S. 490 (1993), that regulating the 

disposition of abandoned property is a traditional exercise

of state authority. See id. at 502. When Congress 

legislates in an area traditionally within the purview of the

states, "we start with the assumption that the historic

police powers of the States were not to be superseded by the

Federal Act unless that was the clear and manifest purpose of

Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 

230 (1947). Congress may signal such intent by an express

statement of pre-emption or by pervasive regulation of the

area. The presumption against pre-emption may also be

rebutted when there is a dominant federal interest or when

state law produces a result inconsistent with the federal

statute. Id. 

There is no express pre-emption clause in the

legislation at issue here, such as there was in the statutory

scheme implicated in the recently decided Medtronics, Inc. v. 

Lohr, 116 S. Ct. 2240, 2250 (1996). Nor is federal 

-18- 18

regulation of bank failures so pervasive that it indicates an

intent to preclude any supplementation by state law.13

However, as the district court aptly noted, the federal

government has a strong interest in regulating responses to

bank failures, particularly when the guarantee of federal

insurance is involved. Massachusetts v. FDIC, 916 F. Supp. 

at 59.

There also are actual conflicts between the FDIA

and the MAPA, and so compliance with both federal and state

law is not possible. In light of the reasonableness of the

determination that states acting under abandoned property

statutes do not qualify as depositors under 1822(e), any

state law conferring on Massachusetts the right to act as a

depositor necessarily conflicts directly with federal law.

Another fundamental inconsistency between federal

and state law concerns the ultimate disposition of insurance

proceeds for abandoned accounts. While the MAPA requires

that FDIC-Corporate turn over insured deposits and that

 

13. In other areas, where Congress has intended to pre-empt
state abandoned property statutes, it has done so explicitly.
Cf. 31 U.S.C. 1322(c)(1) (certain sums to be held in 
Treasury account notwithstanding state abandoned property
laws). Accordingly, any congressional intent to occupy the
field here could be expected to be more clearly stated.
E.g., Louisiana Pub. Serv. Comm'n, 476 U.S. at 377 (declining 
to find field pre-emption where federal statute neither
expressly refers to state law nor uses the word "pre-
emption"); Grenier v. Vermont Log Bldgs., Inc., 96 F.3d 559, 
563 (1st Cir. 1996) (even with express pre-emption clause,
Congress did not intend to occupy the field totally).

-19- 19

transferee banks turn over transferred deposits to the

Commonwealth, under the relevant version of 1822(e), these

funds revert to one of FDIC-Corporate's insurance funds

either after eighteen months or at the termination of the

receivership estate, whichever occurs later. Pub. L. No.

103-44, 2(b) (1993).

And there is conflict, not congruence, between

other portions of the statutory schemes as well. For

example, state and federal law conflict over the time frame

in which a depositor may claim an abandoned deposit. The

relevant version of the federal provision eventually

extinguished a depositor's right to an unclaimed deposit,

while the MAPA extends the right of a depositor to make a

claim in perpetuity.14 Mass. Gen. L. ch. 200A, 10(a). We

conclude that 1822(e) pre-empts the MAPA with respect to

the federal scheme for deposits that are abandoned and

therefore that the Commonwealth is not entitled to the

claimed insurance proceeds.

 

14. There are other differences as well. Section 1822(e)
requires FDIC-Corporate to mail two notices regarding any
unclaimed deposit, whatever its amount, the first thirty days
after insurance payments are inititated and the second
fifteen months later, to the last known address of the
depositor. The MAPA would require FDIC-Corporate to send out
additional information: a report to the State Treasurer
describing any property abandoned under the MAPA, and a
notice to the owner of any account containing more than $100.
Mass. Gen. L. ch. 200A, 7, 7(A). However, while
different, these notice requirements do not actually conflict
with each other.

-20- 20

Massachusetts makes a final argument that it is

entitled to the insurance proceeds because, as a matter of

federal law, it is a fiduciary for depositors. Federal

regulations acknowledge that there may be "fiduciaries" or

"custodians" whose status is apparent from the books and

records of the failed bank and who, as a matter of federal

law, are permitted to stand in the shoes of the depositors

for some purposes. 12 C.F.R. 330.4, 330.6 (1996). The

Commonwealth argues that it qualifies as a fiduciary whose

status is apparent from the banks' deposit account records

and that it therefore is entitled under the federal

regulations to the insured value of abandoned deposits. This

argument fails because the Commonwealth locates the source of

its fiduciary status in state law provisions that are pre-

empted by the applicable version of 1822(e).15

IV.

 

15. Additionally, the district court correctly ruled that
the Commonwealth's claimed fiduciary status is not readily
apparent from the face of the banks' deposit account records
as required by the regulations. Massachusetts v. FDIC, 916 
F.Supp. at 60. Massachusetts argues that the district
court's cramped interpretation of the term "deposit account
records" is at odds with the more expansive approach of FDIC 
v. Fedders Air Conditioning, 35 F.3d 18 (1st Cir. 1994) 
(noting that "deposit account records" include a variety of
items). But unlike the interpretation urged here by the
Commonwealth, Fedders involved discrete items contained in 
the bank files and did not require the FDIC to cross-
reference deposit account records with abandoned property
reports that might not even be kept at the banks. This
process would "corrode the FDIC's core mission" of quickly
determining insurance liability. Massachusetts v. FDIC, 916 
F. Supp. at 60.

-21- 21

The Commonwealth also argues that the district

court erred in dismissing as time-barred Massachusetts' claim

as a creditor of the receivership estate, Massachusetts v. 

FDIC, 916 F. Supp. at 61. The FDIA sets statutory bar dates 

for claims against FDIC-Receiver. The district court lacks

subject matter jurisdiction over any claim not filed in

accordance with these requirements. 12 U.S.C. 

1821(d)(13)(D). Accordingly, the district court dismissed

the action. That dismissal was correct.

Creditors must file their claims with FDIC-Receiver

by the date specified in a published notice.16 This date

must be at least ninety days after the publication of the

notice. 12 U.S.C. 1821(d)(3)(B)(i). Claims not filed by

the specified date are time-barred. Id. (5)(C)(i); Simon v. 

FDIC, 48 F.3d 53, 56 (1st Cir. 1995); Marquis v. FDIC, 965 

F.2d 1148, 1152 (1st Cir. 1992). The one statutory exception

to the claims bar is for creditors who did not receive notice

of the appointment of the receiver in time to comply with the

filing date, but who did file the claim in time to permit

payment. 12 U.S.C. 1821(d)(5)(C)(ii).

Massachusetts did not meet the filing deadline for

creditors. Nor did its claims fall within the statutory

exception: the Commonwealth had prompt notice of the

 

16. This notice is also mailed to all creditors shown on the
institution's books. Id. 1821(d)(3)(C). 

-22- 22

appointment of receivers for the failed bank. Massachusetts

presents two basic arguments why it should receive a more

generous filing period: that it is not just a creditor but

stands in the shoes of depositors as a fiduciary or

conservator, and that the FDIC in the past had permitted it

to do so and is now bound by that prior position.

Massachusetts' theory appears to be that as a fiduciary of

the depositors, it had no claim against FDIC-Receiver for the

pro rata value of the abandoned deposits until the expiration

of depositors' rights to claim the insured value of their

accounts. According to the Commonwealth, its 90-day filing

period17 for claims against the receivership estate only

began to run eighteen months after the appointment of a

receiver for the failed banks, effectively creating a time

limit of eighteen months plus ninety days.18

FDIC-Receiver's position is that states are not

entitled to the more lenient time limits applicable to

depositors filing as creditors. This position has the virtue

of being largely consistent with the view taken by FDIC-

 

17. The statute says that the FDIC may specify any period
ninety days or longer. In this case, as in most others,
FDIC-Receiver set a 90-day filing period.

18. The premise on which this argument is based is
incorrect: since the enactment of the UDAA, depositors have
the longer of 18 months or until the end of the receivership
estate to file insurance claims. Pub. L. No. 103-44, 2(b)
(1993).

-23- 23

Corporate.19 Further, this decision is not economically

irrational. It protects the federal insurance funds to a

certain extent, thereby reducing the cost of the thrift

clean-up to the taxpayer. FDIC-Receiver pays out what is

left of deposits pro rata to creditors. FDIC-Corporate is

itself a creditor of the receivership estate to the extent

that it has paid insurance and became subrogated to

depositors' rights. 12 U.S.C. 1821(g). FDIC-Receiver's

policy gives creditors a small window to assert their claims,

which benefits all timely claimants, including FDIC-Corporate

as subrogee.

The Commonwealth's claim that it stands in the

shoes of depositors fails. The claim is based on the premise

that Massachusetts can be a depositor under 1822(e) and

also requires that 1822(e) be read together with 1821(d),

the statutory provision setting forth the bar dates.

However, nothing in the language of these provisions suggests

that they should be read together. Moreover, for the reasons

outlined earlier, FDIC-Corporate's determination that the

Commonwealth does not stand in the shoes of depositors is a

reasonable one. Because the Commonwealth cannot stand in the

 

19. FDIC-Receiver has apparently chosen to treat the
Commonwealth acting under the MAPA as a general creditor for
the purposes of the claims bar statute, notwithstanding the
FDIC's determination that the MAPA does not render the
Commonwealth a depositor for purposes of 1822(e). The
basis for this choice is not before us.

-24- 24

shoes of depositors, its argument that its claim did not

arise until the end of the 18-month period for filing

insurance claims with FDIC-Corporate is unavailing.20

The argument that Massachusetts should be allowed

the more generous filing period because it had been allowed

that time period in the past also fails. The language of 

1821(d) itself is clear. The receiver must "promptly publish

a notice to the depository institution's creditors to present

their claims, together with proof, to the receiver by a date

specified in the notice which shall not be less than 90 days

after the publication of such notice," 12 U.S.C. 

1821(d)(3)(B)(i), and "claims filed after the date specified

in the notice published under paragraph (3)(B)(i) shall be

disallowed and such disallowance shall be final," id.  

1821(d)(5)(C)(i). FDIC-Receiver's interpretation of the

statute, that a state must file its claim against the

receivership within ninety days of receiving notice from the

FDIC or be barred from doing so in the future, tracks the

plain statutory language. The statutory language does not

admit the distinction the Commonwealth urges between so-

called "deposit" creditors and "trade" creditors. Even were

there some ambiguity about whether 1821(d) should be read

in light of 1822(e), reading the two sections together does

 

20. While it is true that a claimant may not file until his
claim comes into being, Heno, 20 F.3d at 1209, here the 
claims arose, if at all, before the banks failed.

-25- 25

not extend the claims bar date for creditors of the

receivership estate.

Further, it is far from clear that there has been

any reversal of "policy" by the agency on this point. Even

viewing the evidence in the light most favorable to the

Commonwealth, as required in reviewing the district court's

grant of summary judgment, Hodgkins v. New England Tel. Co., 

82 F.3d 1226, 1229 (1st Cir. 1996), there is no support for

the argument that FDIC-Receiver had a consistent policy of

honoring states' claims filed within eighteen months plus

ninety days of receiving notice of the receivership. The

Commonwealth's case rests on two pieces of evidence. First,

FDIC-Receiver sent a letter to the Commonwealth, dated July

1993, containing language that Massachusetts views as

confirming the alleged policy. This interpretation is not

supported by the language of the letter. Second, FDIC-

Receiver honored an untimely claim by Massachusetts for

abandoned deposits held in one of the banks that failed

around the same time as the other banks involved in this

litigation. An isolated settlement decision is not evidence

of a prior policy.

V.

The judgment of the district court is affirmed. No 

costs are awarded.

-26- 26